## CLOUD *vs.* THE STATE OF GEORGIA.

The evidence showing that deceased persistently followed the wife of accused, although frequently appealed to by the accused to let her alone, and that on the occasion of the killing accused saw deceased and the wife together under circumstances which might justify a belief by him that they were having or about to have sexual intercourse, it was error to refuse to charge: "If the defendant killed the deceased for the purpose of preventing him from having criminal intercourse with defendant's wife, and if the killing was then and there necessary to prevent the deceased from accomplishing his purpose to have criminal intercourse with the defendant's wife, then it would be for you to say whether this would be one of those instances enumerated in sections 4331, 4332, and 4333 of the code

of Georgia, and if you find such to be the case, then you would be authorized to find the killing to be a justifiable homicide, and the defendant not guilty." ·

October 17, 1888.

Criminal law. Charge of court. Husband and wife. Before Judge RICHARD H. CLARK. . Fulton superior court. March term, 1888.

Robert Cloud was indicted for murder. The testimony for the State showed that the killing occurred about midnight in a little alley near defendant's house. The night was dark. The deceased and the wife of defendant were going from a negro church festival toward defendant's home, and had gone into the alley leading to defendant's home when the killing occurred. Whether or not they had halted in the alley was not shown, but the testimony for the State tended to show that the shooting occurred about a minute or other very short time after deceased and defendant's wife turned off a main street and entered this alley. Deceased was shot in the forehead by defendant with a shot-gun. They were so close together that the wound was almost as if made by a rifle bullet. Cloud and his wife were together at the festival, but did not leave there together. When deceased was found, after the killing, he had on his coat and vest and his pants were buttoned up. If he and the woman had been standing up or lying down together, the one could not have been wounded and not the other, probably, unless the gun had been put past her. There was no testimony that the woman was wounded. The wound could not have been made if deceased had been lying face down. The gun was discharged about two and a half feet from defendant's head. There were powder burns on his head. Just after the shooting defendant told his mother: "I told Georgia" (defendant's wife) "to stay away from that

nigger, and that nigger to stay away from her, and now I reckon he will stay away." After this, defendant went at once to the police station. He stated there that he had come upon deceased with his wife; that he had been to a church entertainment and came home and his wife was not there, and he went out in the alley and found her and deceased together down there and he said, "Oh, yes; I have caught you," and deceased jumped up and knocked him down and tried to hit him the second time and defendant ran down home, which was a little way off, and deceased remarked that he had ran him in his hole, and defendant reached inside and got his gun and said, "Well, you won't run me any more," and deceased stooped down and picked up a rock, and about that time defendant shot. When defendant came to the station, he was very muddy and looked like he had been knocked sprawling on his face. The mud was on his cuffs, elbows and knees. The next day, before the coroner, defendant stated that he got his gun and went up there and found them up there and killed deceased; that he found them down there and shot into the pile. He did not say before the coroner that deceased made an attack on him, but said that when he discovered them, they looked like they were getting down or up, and he fired; that deceased was getting up and had his head up so he could see him and hit him (deceased) the way he shot him. He also stated at the station (witness thought) that deceased was at the festival, and that he (defendant) warned him not to have anything more to do with the woman; also that the woman was still down when he shot, and when he shot she ran, and he fired the other barrel at her. When the police went, at defendant's instance, to look into the killing, they found deceased lying face down, about seventy-five or eighty feet from the house of

defendant, and deceased's hat about six or seven feet from him. From the street referred to it is downhill to where deceased was found, about seventy-five or eighty feet from the street. He was lying up the hill. There was no mud in the alley, which was twelve or fifteen feet wide. In his statement before the coroner, defendant said that a few days before the killing, he told deceased that this woman was his wife, and that deceased must let her alone and must keep away from her.

For the defendant the evidence showed that deceased had, for some time before the killing been persistent in his attentions to the wife of defendant, that he had been repeatedly asked by defendant to desist, and had indicated to defendant his intention not to do so; that he had attempted to procure a place where he could have criminal intercourse with her, and had stated that he had been broken up at another place which he had had for the purpose. Defendant's wife was not averse to but sought the company of deceased. The familiarities between them were known to others as well as defendant. The night of the festival, defendant again asked deceased to let her alone, and deceased said to defendant that he (deceased) was going on with her. Defendant went to the festival alone; his wife was there, but that she came with deceased was not shown by the testimony. When defendant and deceased had the conversation at the festival, deceased said he had just come from his lodge. Deceased was seen talking to the woman at the festival, but defendant did not seem to get angry at it. Deceased and the woman left before defendant. They had been gone ten or fifteen minutes before defendant started towards home, which was about a quarter of a mile from the church. Defendant tried to get his wife to go home with him from the fes-

tival and she said she was not ready to go; he also told her there, in the hearing of deceased, that he had told her two or three times to keep away from deceased. The testimony of defendant's witnesses as to what he stated at the police station was to the effect that deceased was with his wife at the entertainment; that he had spoken to her there and asked her not to have anything to do with deceased; that her answer did not satisfy him; that he went home and came back through the alley and caught them in a situation "not of a pleasing character to him," and shot and killed deceased and then shot her. His witnesses did not remember his having stated that deceased threw a rock at him or knocked him down, and they were so situated that they could have heard the statement if he had made it.

Defendant's statement was, in brief, as follows: He had discovered an intimacy between his wife and deceased; before the night of the killing, he had found deceased under suspicious circumstances about his premises; had repeatedly asked him to keep away and to let her alone, but deceased refused to do so; always provided well for her; asked her not to go to the festival but she would go, and went by herself, although he told her he would go with her; he went to the church, and was standing on the outside when deceased came up; again asked him not to go after his wife, and deceased immediately went to her; during the festival, again asked deceased to desist and called his attention to there being so many young girls and asked him why he could not let his wife alone; deceased answered insultingly in such a way as to indicate that he was or intended to be criminally intimate with her; defendant left the church and came back to it, but in the meantime deceased and the woman had gone; defendant went home and got his gun, and on returning, coming up the alley, discovered

them, deceased being in the act of beginning criminal intercourse with her; deceased raised his head, and defendant then fired, and deceased "fell under him like"; the woman jumped up and ran away, and he shot the the other barrel.

The defendant was found guilty of voluntary manslaughter. He moved for a new trial on the gounds, among others, that the verdict was contrary to law and evidence, and because of error in the refusal of the court to charge as stated in the decision. This motion being overruled, he excepted.

HOKE SMITH and J. R. WHITESIDE, for plaintiff in error.

C. D. HILL, solicitor-general, and W. P. HILL, for the State.

BLANDFORD, Justice.

Cloud was indicted for murder, and was found guilty of voluntary manslaughter. The main allegation of error is, that the court refused to charge upon section 4334 of the code, as requested by counsel for the defendant ; which section is as follows : " All other instances which stand upon the same footing of reason and justice as those enumerated, shall be justifiable homicide." The instances enumerated are those contained in the preceding sections,' and are cases of justifiable homicide. The court was requested to charge the jury that " if the defendant killed the deceased for the purpose of preventing him from having criminal intercourse with the defendant's wife, and if the killing was then and there necessary to prevent the deceased from accomplishing his purpose to have criminal intercourse with the defendant's wife, then it would be for you to say whether

this would be one of those instances standing upon the
same footing of reason and justice as those enumerated
in sections 4331, 4332 and 4333 of the code of Georgia;
and if you find such to be the case, then you would be
authorized to find the killing to be a justifiable homicide,
and the defendant not guilty." The court refused to
give in charge anything at all upon section 4334 of the
code, holding the same inapplicable to the case. The
evidence shows that the accused had frequently appealed
to the deceased to let his wife alone. This was proved
by testimony other than the defendant's statement. And
it appears that the deceased persistently followed up the
defendant's wife; and on the occasion of the shooting,
the deceased was seen a short time before he was killed,
with the wife of the defendant on his arm, going up a
dark alley. This section of the code (4334) certainly is
intended to have some effect; and if it is to have any
effect at all, the court should charge the jury upon it, as
well as upon the other instances of justifiable homicide;
and it should be left to the jury to say whether or not
the facts of the case on trial stand upon the same foot-
ing of reason and justice as those enumerated in the
code. The court might instruct the jury what is a like
instance of reason and justice; and it is for the jury to
say whether or not the case on trial stands on the same
footing with the cases enumerated. We think the
charge requested in this case was proper and should
have been given. It was the same thing charged in the
case of *Hill vs. The State*, 64 *Ga.* 453; and this court
held that it was a proper charge in that case. This re-
quest to charge was doubtless taken from the charge of
Judge Hillyer, which was affirmed in the case just cited.

We do not think that any man is justifiable in killing
another who has committed adultery with his wife, after
the adultery has been committed; for that would seem

to be killing in a spirit of revenge, which would make it murder. The killing must be done to prevent the adultery, and there must be a necessity for it. The taking of human life must be necessary to prevent this great wrong upon the peace and happiness of families, in order to justify the homicide. The law is, that the killing must be to prevent the adultery, and it is only in such case that the killing would be justified.

The judgment of the court below is reversed, because of the refusal to give in charge the request of the defendant as above set out.

Judgment reversed.