MAYS *v.* THE STATE.

Under the evidence, taken in connection with the prisoner's statement, a verdict for voluntary manslaughter was correct; and although the court committed some errors in admitting evidence,

these errors were harmless, inasmuch as they bear upon the charge of murder of which offence the prisoner was acquitted.

December 28, 1891.

Criminal law. Manslaughter. Husband and wife. Before Judge MILNER. Bartow superior court. July term, 1891.

Will Mays was indicted for murder, and was found guilty of voluntary manslaughter. He admitted the homicide and claimed that it was justifiable. He introduced no evidence. In the evidence introduced by the State appeared the following: By invitation of the defendant's wife Ellen, the deceased went to their house on the night of the killing, she having told deceased that defendant had gone off and would not return until a subsequent day. She knew that her husband was to be at home that night. The deceased was undressed and in one of the front rooms of the house with her when a knocking on the door was heard. She told him to go into the back room and squat down. He did so, and was shot by the defendant through a window from the outside. He attempted to escape, and the defendant shot him a second time. Both shots went into the back, and either was fatal. He ran from the house, and as he did so the defendant shot at him again; and when he reached a neighboring lot and laid himself down, or fell, by the fence, the defendant shot twice more, one of the balls striking the ground quite near him, while the defendant said, "Now, you G— damned white son of a bitch, lie there and die; I'll learn you how to run after negro bitches." When the pistol was fired at the house a woman's, or women's, scream was heard, and the defendant cried, "You damned bitch, I have got you now." Ellen was a lewd woman long prior to the killing, and there were circumstances indicating that the defendant knew it and had fought her on account of it. He ran away, and was subsequently arrested in Birmingham,

Alabama. In his statement he denied that he ever had any reason to suspect his wife, and gave, in substance, the following account: When he reached home he knocked at the front door, and his wife did not speak for two or three minutes. He called her two or three times before she answered, and finally she asked if it was he, and told him to wait till she got a match. He replied all right, and stepped around the house to urinate. As he went by the back window with his face turned towards it, he saw an undressed man step from the bedroom into the back room, and asked who it was. The man sat down in the corner right at the window, and defendant asked who it was. He did not know who it was, and it occurred to him that it was a trifling negro. Ellen came to the door, and he repeated his inquiry. She replied, " It is nobody," and defendant said he knew better. He pulled out his pistol, stuck it in the window and said, " Now, if you don't tell me who you are, I am going to shoot you, " and again asked Ellen who it was and what he was doing in there, repeating the question two or three times and receiving no answer. He then struck matches and put them into the crack, but as he struck each one his wife threw water and extinguished them. He threatened to kill her if she put out the last one he struck, but she did so, and the man inside moved; whereupon the defendant fired at him. Some one at the gate cried that he was coming, and the man inside jumped on his all fours as if he couldn't stand, upon which the defendant fired the second shot. He then ran and broke down a door and entered the house shooting the pistol; he found no one inside, and ran out again to a neighbor's house and was told that she was not there but kept on by and did not come in, and on returning he saw the deceased fall over the fence of the neighboring lot. Defendant did not fire the pistol after leaving the house; all the shooting was

done there. He and a neighbor went to where the deceased was lying, and the deceased acknowledged that defendant was not to blame. Under the advice of the neighbor, the defendant determined to give himself up, and had started to do so when he remembered that he was a negro and the deceased was white.

. To the overruling of his motion for a new trial the defendant excepted. The motion contained the grounds that the verdict was contrary to law and evidence, and a number of grounds not material here.

Akin & Harris, for plaintiff in error.

A. W. Fite, solicitor-general, *contra*.

Simmons, Justice.

The facts will be found in the official report. Under these facts, the able counsel for plaintiff in error contended that the verdict for voluntary manslaughter was erroneous, that the jury should have found Mays justifiable in killing the deceased. We have carefully examined the authorities upon this subject, and they are uniform in holding that a person who kills another under circumstances such as disclosed by this record is not justifiable, but is guilty of manslaughter. This court has held that it would be competent for the jury, under §4334 of the code, to find the homicide justifiable if it was done for the purpose of preventing and was then and there necessary to prevent adultery with the defendant's wife, and in a case calling for it, it is error to refuse a proper instruction touching their power to so find. *Hill* v. *The State*, 64 *Ga.* 453; *Cloud* v. *The State*, 81 *Ga.* 444. But this court has never held that the husband would be justifiable in killing after the adultery has been committed. On the contrary, it was ruled in *Hill's* case that this could not be one of the "other instances which stand upon the same footing of reason and justice as those enumerated" in the code, because

the enumerated cases all contain the element of defence or prevention. All the courts, except those having an express statute on this subject, hold that if a man finds another committing adultery with his wife and kills him on the spot, it is manslaughter. We agree to this view, with the qualification that the jury may acquit of all crime if they find that the killing was done and was necessary at the time either to prevent the commission of the adultery or the completion of it; and with this qualification we adopt the following statement of the law by Gilpin, C. J., in State v. Pratt, 1 Houst. (Del.) 265: "The law, in compassion for human infirmity, extends its indulgence to acts springing from sudden passion, justly excited, by adequate provocation, when committed instantly, or before reflection has intervened or reason has had time to resume its controlling power. But if the slayer, instead of killing the adulterer in the act or at the time of the adultery committed, kills him on the ground of suspicion or belief, or even on the ground of clearly ascertained and known previous adultery, his case is without palliation or excuse, and he is justly held to be guilty of the crime of murder. Killing under such circumstances is not killing under adequate provocation; on the contrary rather, it is killing from a feeling of hatred and revenge. . . In order to reduce the crime from murder to manslaughter, it is necessary it should be shown that the prisoner found the deceased in the very act of adultery with his wife. I do not mean to say that the prisoner must stand by and witness the actual copulative conjunction between the guilty parties. If the prisoner saw the deceased in bed with the wife, or saw him leaving the bed of the wife, or if he found them together in such a position as to indicate with reasonable certainty to a rational mind that they had just then committed the adulterous act, . . it will be sufficient to satisfy the requirements of the law in this regard, and

if, under such circumstances he then and there struck the mortal blow, his offence would amount to manslaughter only." The following authorities are to the same effect: 2. Bish. Crim. Law, §708; 1 Whart. Cr. Law, §459 *et seq.*; 1 Russell on Crimes (9th ed.), *784; 1 Archb. Cr. Pr. 707; 1 Horr. & Thomp. Crim. Def. 754; Notes to Price *v.* State, 51 Am. Rep. 328; State *v.* Samuel, 64 Am. Dec. 596; State *v.* Neville, 6 Jones' Law, 433; State *v.* Harman, 78 N. C. 515; State *v.* Holme, 54 Mo. 153; Commonwealth *v.* Whitler, 2 Brewst. 388. The prisoner's statement shows that he arrived at home at night and knocked on the front door several times. His wife finally told him to wait a minute. The husband then walked to the rear of the house, and looking through the window saw a man squatting in a rear room undressed. He called out to know who it was, and his wife said it was nobody; he undertook to light matches, his wife threw water upon them and extinguished them. The deceased then started to run in a stooping position to the front door, and the husband shot him through the window and killed him. The deceased was seeking to escape from the husband's vengeance, and the latter shot to prevent that escape. This shows it was not necessary at that time to kill the deceased to prevent the adultery, so as to make the homicide capable of standing upon the same footing of reason and justice as the instances of justifiable homicide enumerated by the code. But the provocation being intolerably great, it was enough to reduce the offence from murder to manslaughter, according to the authorities cited above. We think that, under the law and the evidence, the verdict was right.

*Judgment affirmed.*