Under all the evidence the theory of voluntary manslaughter was involved in this case; and the failure of the court to give in charge to the jury the law applicable thereto was error, even though there was no request that such charge be given.
 No. 14660. OCTOBER 8, 1943.
Auston Burke was convicted of murder, and to the overruling of his motion for a new trial he excepted. He insists, in addition to the general grounds, that the court should have charged the law of voluntary manslaughter, his contention being that the evidence demanded such charge.
The State introduced testimony of several witnesses who testified substantially to the following facts. The deceased, Verline Dukes, operated a restaurant in Fulton County. On the night of November 14, 1942, about ten o'clock p. m., the defendant went into the restaurant and ordered a glass of tomato juice, and as he was paying Dukes for the tomato juice with his right hand he attempted to take a package of dried meat skins off the counter with his left hand. A controversy arose, in which Dukes insisted that Burke either pay for or return the meat skins. Burke began cursing, and Dukes ordered him out of the restaurant, took the meat skins from *Page 703 
him, and pushed him out the door. Burke dropped the glass of tomato juice on the floor, and it was broken. Burke then came back into the restaurant and demanded that his money for the glass of tomato juice be returned or that he be given another glass of tomato juice. This Dukes refused to do. Whereupon Burke picked up a rack of potato chips from the counter, and with the statement, "I will take this for my God damn tomato juice," ran out the door. Henry Clay, an employee of Dukes, went out of the restaurant and recovered the potato chips from Burke. There was a difficulty on the outside of the restaurant, in which the defendant, his brother Marvin Burke, Henry Clay, and Verline Dukes, all participated. The witnesses for the State, other than Henry Clay, testified to little of the details of the fight on the outside of the restaurant, they being on the inside. One witness testified that Henry Clay had returned the skins and potato chips before the fight started and before the deceased, Verline Dukes, went on the outside. A witness who was on the outside testified: "These two boys went down the street running, the brothers. They said they were brothers. One was running behind the other. One said, `I will be back.' He was the one that was in front. He had a scar, a fresh bleeding scar, the other one. It was bleeding, I saw it." About one hour later the defendant, according to several witnesses who positively identified him, came back and again entered the restaurant. Dukes was behind the counter. The defendant said to him, "You hit my God damn brother with a pistol," and immediately started shooting. Five or six shots were fired. Dukes walked a few steps and died within a very few minutes.
Henry Clay, for the State, testified as follows: "I was working for a man named Dukes at Auburn and Fort Street on the 14th of November last year. I was cooking in the back and working behind the counter too. A disturbance started about ten o'clock that night. A young man came in and ordered a can of tomato juice. The young man acted like he may have been half-way drunk. After he ordered the tomato juice I came from the kitchen behind the counter. I heard Dukes ask him to pay him for some skins. Regarding whether I see the young man I am describing to-day, I don't know the young man when I see him. The only way I know him was by a leather lumber-jacket. I did not pay enough attention to his looks to identify him. I see somebody that resembles *Page 704 
him to-day. He is over there [indicating the defendant]. Regarding what happened between that man and Dukes, I heard Dukes ask the boy to pay him for the skins, and the boy started looking in his pocket like this. Another fellow walked upon the right side. About that time he looked up, and this fellow said, `Give me my money,' and started cursing. That was the one that looked like him. I don't know whether it was this man. Dukes said, `I have got a bunch of people in here. Don't curse.' He kept cursing. Dukes said, `Get out. Don't do like that.' He said he was not going anywhere. Dukes pushed him to the door, opened the door and pushed him outside. The young man came back in and started cursing again. I said, `Friend, you must have a mother or sister or somebody, a girl or lady.' I said, `If I were you. I would not do that. You see all these people will be leaving and going.' He quieted down a moment, but did not pay for the skins. I go back in the kitchen. I came back to the front, and Dukes said, `Go out and see if you can get him quieted.' I go outside on Auburn Avenue towards town. I said, `Buddy, I would not do that if I were you. Give me the skins back. Give it to me and call it off.' He handed them to me. I started in the place, and he grabbed me by the vest and tore all the buttons off. When he did that I slammed him one, and he fell in the street against an automobile. He got up again, and I hit him. Somebody said, `You cannot do that,' and lammed me on this side. The man that I lammed did not hit me. Somebody came from Fort on this side. I lammed that man on the right. Somebody got me on the left. Dukes came out. I don't know what happened when the man lammed me. I don't know what happened to the man that I lammed. Both must have went off walking. When I arose from under the shower I came in to see what was wrong with me. Somebody came back later. I was there. At five minutes to eleven I went behind the counter, and Dukes said, `Give this fellow a bottle of Schlitz beer. Give him a quart bottle.' I said, `I am going to the kitchen.' I was looking down in the refrigerator to get the beer. I heard something say, `Bow! Bow! Bow!' I kept my head in the beer. I did not see who was making those shots. I did not see him run out. I saw Dukes afterwards. Dukes was lying in the floor."
Eleanor Weems, for the defendant, testified: "I remember the *Page 705 
night that Dukes was shot. I was down there that night. I got there the early part of the afternoon. It was about nine-thirty or a quarter to ten when I entered this special place. . . I know this boy here. I know his brother. I have been knowing him for two years. . . I saw something happen there that night. What happened when I first saw it, about the tomato juice, I don't know and cannot say. I saw this boy kicked and pushed out the door. That was Auston. . . I said, `What is Auston crying about?' He came in and said, `Give me my money or tomato juice, one.' They did not give him his money or the tomato juice. There was some potato chips on the counter on a little stand like this, and he picked them up and walked outside the door. He stood there. A waiter went out and got the chips and brought them back in. About that time his brother Marvin came in. He did not say anything. I did not hear him. He leaned on the counter. Auston was still crying. I was sitting in the last booth on the right-hand side next to the kitchen door, and this waiter got a mop. . . He carried the mop outside. Auston had walked down the street, and he was going to make Auston mop the tomato juice. He slapped Auston. He slapped him again. His brother walked out the door. The waiter knocked Auston down, or he fell, and Mr. Dukes ran out with a pistol and waved the pistol. Johnny and I went outside. . . Auston stood aside, and Mr. Dukes hit him in the head with the barrel part of the pistol. I reckon it was the barrel part. When he hit him he stood straight up and fell between the curbstone and the fender of a car. When he fell we picked him up and walked down the street. . . Auston was with us. . . Blood was running off his eye. He wiped it off. He was so bloody. He went down the street. . . Johnny and I went back and sat down in the same place where we were at first. A fellow, dark fellow, came in with a black cap and brown corduroy jacket, sport corduroy jacket. He had the collar turned up. The way I was sitting I could get side view of him. Knowing Auston and Marvin as I do, I know them well enough to know it was not them. . . I did not see him run out after the shooting. There was quite a commotion. There were a lot of people there. I did not hear Auston cursing until that man struck him. He was not doing anything but crying. Nothing was said about any cursing. He said, `Give me my money.' . . He was being the counter *Page 706 
when he was shot. I did not see him any more after the shooting. . . I heard five shots. . . I did not hear the man say anything to Dukes before he shot him. He did not say anything. . . I don't know who knocked the tomato juice out of his hand. I could not say whether it was knocked or he dropped it. . ."
The defendant made the following statement. "On November 14th about ten I go in this place at Auburn and Fort. I ordered a glass of tomato juice. I was standing drinking the tomato juice. This fellow Harry or Henry — I don't know which is his name — knocked the tomato juice out of my hand, and I asked for another. He cursed and said, `I will not give you a God damn thing.' He told Henry to push me out in the street. Henry pushed me out in the street and slapped me. I came in. I said, `You are not going to give me another tomato juice?' He said `No, I am not going to give you a God damn thing, like I told you.' I said, `You are not going to give it to me?' He said `No.' The tomato juice was spilled on the floor. Duke was standing behind the counter. Henry was on this side of the counter. Duke was inside the counter. I went outside. I stood in front of his door. I took the skin. Henry came and got the skin. My brother was standing inside the place with a big Alpa hat and a tan jacket. He came up when Henry and me were scuffling. He said, `Which one of you all hit my brother?' They got to fighting. Duke ran out and struck him with a big black pistol and pushed him, and he fell between the curbing and an automobile. I go down the street. I met the Sergeant and another fellow. This girl and boy told my brother to go the hospital. I went down and met Sergeant Davis standing by the fence. Everybody was going to the place. I go back. Duke was laying down by the autophone, piccolo. The Sergeant was standing about middleways the floor. The Sergeant was trying to run the crowd away. A girl came out and said she was shot in the knee. I went home. Quite naturally the second girl on the stand knew me. She used to come to my house. If she knew I did the killing, why did they send the officers to 183 Houston? After they figured they could not find anybody, they thought they might put it on me. I worked Tuesday, Wednesday, and Thursday. I got a wire to go to Jacksonville. I had a gray overcoat in pawn at the Northside Loan Office on Edgewood Avenue. I worked three days. I got my money from Mr. Crawford, *Page 707 
and went to Dublin. My father is dead. I went to see my mother in Dublin. I went to Jacksonville from Dublin. Sunday me and my brother were sitting together in the room. The time that the police and detectives came Wednesday before Thanksgiving they asked, `Which one of you is Burke?' I said `I am Auston.' He said `You are the one I want.' I said, `I have a brother that works for the New York Laundry on Liberty Street.' He arrested him and Willie Earl Kenyon. I stayed in jail Thanksgiving. Friday night the police came. I did not know who they were. Quite naturally I was not going to tell something to anybody I didn't know. When he told me, `I am a detective from Atlanta,' I told him I was the one that had the tomato juice. That is all I have to say."
If this evidence was such as would have authorized the jury to find the defendant guilty of the offense of voluntary manslaughter, it was the duty of the judge to charge the law upon this subject, and failure to do so would be error demanding a new trial, even though there was no request to charge on that subject. Freeman v. State, 158 Ga. 369
(123 S.E. 126); Dennis v. State, 93 Ga. 303 (20 S.E. 315); Tanner
v. State, 145 Ga. 71 (88 S.E. 554); Smith v. State,147 Ga. 682 (95 S.E. 223). The jury has the right to believe the testimony, or any part of the testimony, of any witness in the trial of a case. If the jury on the trial of this case should have believed that portion of the testimony of the witnesses to the effect that the property belonging to the deceased had all been returned by the defendant, and that thereafter the employee, Henry Clay, with a mop in his hand walked out of the restaurant and ordered the defendant to mop up the tomato juice on the floor, and this at a time when the defendant was walking away from and leaving the restaurant, and then the deceased ran out of the restaurant, waving a pistol in his hand, and struck either the defendant or his brother on the head with the pistol, and the defendant then and there had shot and killed the deceased, the law of voluntary manslaughter would certainly have been involved in the case. We do not mean to hold that the jury should have *Page 708 
found this state of facts to be true, but that the jury could have found under the evidence such state of facts to be true. In that event, the question of sufficient cooling time for the voice of reason and humanity to be heard would arise. The matter of sufficient cooling time is a question of fact for the jury to decide. Code, § 26-1007; Burney v. State, 142 Ga. 812
(83 S.E. 937); Williams v. State, 125 Ga. 302 (54 S.E. 108). Under the evidence, the court committed error in failing to charge the law upon the subject of voluntary manslaughter. The judgment refusing a new trial is
Reversed. All the Justices concur.