CAMPBELL *v*. THE STATE.

No. 16382.   OCTOBER 13, 1948.

*Lucian J. Endicott* and *Harry S. Baxter*, for plaintiff in error.
*Eugene Cook, Attorney-General, Paul Webb, Solicitor-General, Dan P. Winn, William Hall, Carl B. Copeland,* and *M. H. Peabody, Assistant Attorney-General,* contra.

WYATT, Justice.   ■   Counsel for the plaintiff in error have expressly abandoned the general grounds of the motion for new trial.

The principal question for decision concerns the court's failure

to charge the law of voluntary manslaughter. Counsel for the accused filed a timely written request to charge on the law of voluntary manslaughter. This request was couched in almost the exact language of the Code, § 26-1006, as it pertains to voluntary manslaughter, and contained all the ingredients of that crime as defined by that section of the Code. The court did not charge the request, nor the law of voluntary manslaughter generally.

The statement of facts does not purport to contain all of the facts and circumstances surrounding the homicide, but is a mere resumé of the general nature of the facts as disclosed by the evidence. There was clearly evidence from which the jury could have found that the accused, with deliberation and premeditation, murdered his wife. However, the evidence was conflicting; and it is difficult, from the evidence, to determine the circumstances surrounding the commission of the crime. Even the testimony of the main witnesses for the State was contradictory. Amanda Truman, the mother of the deceased, testified: that the defendant first came to her home at about 3 p.m., asked to see his wife; that before she admitted him to the house there was considerable argument, during which the defendant told his wife, "If you don't talk right, I am going to kill you; I am going to kill you anyhow, but I won't kill you now if you talk right." She testified: That she then opened the door; that "Kelly told me that he was not going to hurt my daughter, and I let him in. He said, 'Grace, why don't you want to go back?' She said, 'Kelly, we can't get along together and I don't want to go back.' He said, 'Well, I am going to kill you,' and I sent him back out and fastened the door." Later, under cross-examination, this same witness, testifying as to the same transaction, stated: "As to whether Kelly was acting all right when he came to the house—he just said he wanted to come and talk with Grace. I don't know whether he was mad or not. He was talking pleasant when he was knocking on the door. He was not drunk that I know of. As to what made him so mad so quick, she said, 'We can't get along.' I did not see anything in his hand at that time. It is true that there was a knife lying on the table that Kelly could have gotten if he had wanted some weapon." The witness testified that the defendant made a second trip to the house at about 6 p.m., and that the killing occurred shortly thereafter.

Moselle Fields, a sister of the deceased, testified that the defendant first came to the house at about 5:30 p.m., that she let him into the house through the back door, and that the following occurred: "He asked Gracie, 'Are you and me going back together?' And she said, 'No, we can't get along together, we argue and fuss too much.' He reached over there on the table and said, 'Well, I am going to kill you;' and he went back out the door and went down the alley and got the axe and came back up there and hit the front door." The witness later testified: "He came to the back door and knocked on the door and I let him in. My brother and Grace and her daughter were in the room when I let him in. Kelly was not drunk at that time, and he did not act like he was mad. I did not see nothing in his hand. I don't know whether he had any weapons about him or not; I did not see any. When he came in that time there was a knife lying there on the table. As to whether he could have gotten that knife if he had wanted to, he did grab at it. He throwed it to the floor. He said, 'I don't want to hurt her with a knife.' He told Mama he did not want to hurt Grace with that knife. Mama pushed him out the back door then. I don't think she could have pushed him out if he did not want to go." She testified that the defendant, after leaving the house, returned in about fifteen minutes, began beating on the front door, then went to the back door, entered, and chased the deceased out of the house.

The above quotations are given merely to show the general contradictory nature of the evidence relied on by the State. The question with which we are actually confronted is whether any of the evidence, or any portion of the evidence and the defendant's statement, was of such a character as would have authorized the jury to find the defendant guilty of voluntary manslaughter. If the evidence, or the defendant's statement, or portions of the evidence and portions of the statement combined, raise a doubt, however slight, as to whether the homicide is murder or voluntary manslaughter, the court should instruct the jury on the law of voluntary manslaughter. *Mincey* v. *State,* 27 *Ga. App.* 4, 6 (107 S. E. 546); *Tucker* v. *State,* 61 *Ga. App.* 661 (7 S. E. 2d, 193).

In the instant case, certain portions of the evidence and the

defendant's statement tended to establish the following facts: The defendant and the deceased were separated. He was suspicious of his wife's conduct. (He had told one witness that the mother of the deceased was doing nothing but run a lewd house, or words to that effect. A neighbor testified that he had seen many men going into the house where the deceased lived. The defendant told the arresting officer that he killed his wife because "she had messed him up with a man.") On the date of the homicide the defendant went to the home of his wife's mother, was admitted, and attempted to have a reconciliation with his wife but failed. At this time he was not drunk and was talking pleasantly. There was, at that time, a knife lying on a nearby table and readily available if he had had any intention of killing his wife. The defendant left the house voluntarily at the request of his mother-in-law. Apparently, however, he remained in the vicinity of the house for quite some time. After he had left his mother-in-law saw him at a window and asked him what he was doing there, to which he replied, "I know there is a man in there." (The mother-in-law testified that, seeing the defendant at a window, she said, "Kelly, what are you doing there," to which he replied, "I know a man is in there.") While the defendant was passing by a window he saw a man inside the house. (In his statement, the defendant stated: "I left, and I seen a man by passing the window, and I went on around in the alley and borrowed an axe. I did not know what he had and I wanted to have something to protect myself. I come on back to the house and I knocked on the door, but her Mama came to the door and she did not open the door.") The defendant tried to get into the house, but he was refused admission. He charged that there was a man inside the house. This was denied by those inside. He then borrowed an axe, tried to break in the front door, ran around to the back door, entered, pursued his wife through the house and out into the streets and killed her.

"In all cases of voluntary manslaughter there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. Provocation by words, threats, men-

aces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder." Code, § 26-1007. In *Mack* v. *State*, 63 *Ga.* 693, 696, this court held: "What circumstances will present this equivalence and justify the excitement of passion, and exclude all idea of deliberation or malice, the law does not undertake to say; it furnishes a standard, and leaves the jury in each case to make the comparison, and determine whether the special facts of the case before them come up to that standard or not." See also *Rumsey* v. *State*, 126 *Ga.* 419 (55 S. E. 167); *Coleman* v. *State*, 149 *Ga.* 186 (99 S. E. 627); *Battle* v. *State*, 133 *Ga.* 182 (2), 186 (65 S. E. 382).

Sometimes there is a tendency to confuse the law of justifiable homicide and the law of voluntary manslaughter. It must be remembered that it is unnecessary, in order to constitute the crime voluntary manslaughter, that the killing should occur at the time of the commission of an adulterous act. A killing to prevent the beginning or the completion of an adulterous act is justifiable homicide under our law. But a killing, which is unnecessary to prevent an adulterous act, but which might have been the result of passion engendered by adulterous conduct, or conduct and circumstances which are sufficient to lead the slayer to the belief that adultery is about to be committed or has been committed, may fall within the classification of "other equivalent circumstances," and it is generally a question for a jury to determine whether the special facts of a case before them meet the standard set by law. It is for them to say whether the slayer acted from passion or revenge.

While it has been held that a mere admission by a wife to her husband of an adulterous relationship with another man will not reduce the homicide to manslaughter (*Stevens* v. *State*, 137 *Ga.* 520, 73 S. E. 737, 38 L. R. A. (N. S.) 99; *Humphreys* v. *State*, 175 *Ga.* 705, 165 S. E. 733); admissions, coupled with conduct, or conduct alone, may do so. In the first instance, where the wife merely admits her adulterous act, the crime is not reducible because, under the express provisions of our statute, words alone are excluded from amounting to "other equivalent circumstances."

Illustrative of cases involving manslaughter, where it was

apparent that the homicide was unnecessary to prevent an illicit intercourse, is the case of *Daniels* v. *State*, 162 *Ga.* 366 (4-b) (133 S. E. 866). There the wife had knowledge that her husband had a mistress, and some two months prior to the homicide the wife and the mistress had engaged in a fight growing out of the illicit relationship. The court held: "If, immediately before the homicide, the wife saw the husband and the mistress together and heard the mistress make an engagement to meet the husband about eight o'clock p.m., and, where it might be inferred that such engagement was made for the purpose of illicit intercourse with the mistress, the wife immediately followed the mistress as she left her husband and in a transport of passion and rage the wife stabbed with a knife and killed the mistress, it was a question for the jury to determine whether these circumstances were sufficient to justify the excitement of passion on the part of the wife, and to exclude all idea of deliberation or malice, either express or implied, and it would be for the jury to say whether the killing was the result of that sudden, violent impulse of passion supposed to be irresistible; and it was for the jury to say whether under the circumstances the homicide should be reduced from murder to voluntary manslaughter."

In *Mays* v. *State*, 88 *Ga.* 399, 404 (14 S. E. 560), this court held: "The prisoner's statement shows that he arrived at home at night and knocked on the door several times. His wife finally told him to wait a minute. The husband then walked to the rear of the house, and looking through the window saw a man squatting in a rear room undressed. He called out to know who it was, and his wife said it was nobody; he undertook to light matches, his wife threw water upon them and extinguished them. The deceased then started to run in a stooping position to the front door, and the husband shot him through the window and killed him. The deceased was seeking to escape from the husband's vengeance, and the latter shot to prevent that escape. This shows it was not necessary at that time to kill the deceased to prevent the adultery, so as to make the homicide capable of standing upon the same footing of reason and justice as the instances of justifiable homicide enumerated by the Code. But the provocation being intolerably great, it was enough to reduce the offense from murder to manslaughter."

In *Richardson* v. *State,* 189 *Ga.* 448 (5 S. E. 2d, 891), this court held: "Where it appears from the evidence on a trial for murder that on the night of the homicide the deceased put her ten-months child down by the side of an alley, went into a vacant lot with the husband of the defendant, and lay on the ground with him behind some bushes, and that the defendant immediately thereafter came upon them and assaulted and killed the deceased, the jury . . would have been authorized to find that such circumstances were sufficient to justify the excitement of passion and to exclude all idea of deliberation or malice, either express or implied, and would have been authorized to find the defendant guilty of voluntary manslaughter."

The case of *Smith* v. *State,* 174 *Ga.* 878 (164 S. E. 762), involved a homicide occurring on Wednesday after the defendant had been informed on Monday by another person that his wife had had an illicit intercourse with one Hanks. On the day of the killing the defendant's wife, Nella, and other negroes were at a church for the purpose of cleaning off a cemetery. "While the work was in progress and after Nella had been there for some time, George Smith came up in an automobile with several other men. At the time of his arrival Nella was sitting under a tree with a baby on her lap. Smith went around the church and disappeared from view. Shortly afterwards he came back into view. He asked a witness, 'Have you seen James Hanks here today?' and upon receiving a negative answer, said, 'I heard that he was looking for me and had a gun to kill me, and I would not pay any attention to it, but I met four men in my car looking for James Hanks and if I had found him one of us would have died.' He asked this witness to go and tell Nella that he wanted to speak to her, and the witness refused. Smith then 'walked up behind Nella,' saying, 'Nella, step here a minute.' She returned no answer, and he walked in front of her and said, 'Ain't you coming?' and she still said nothing, and about that time he pulled a pistol, Nella jumped up and ran with the baby in her arms, asking him not to shoot her. He started chasing her, but Nella's sister ran into him and interfered momentarily with his pursuit. After she had run around the cemetery for a distance of about 260 yards she fell down, the baby rolling away on the ground. Smith ran up, put his left hand on her shoulder, and

fired one shot from the pistol into her body while she was on the ground and trying to get up. He then fired three more shots into her body and she died within a few moments." The defendant stated: "So I heard that she was going with this man, and I went and ask Doodlefinger about it, and he told me what he saw him and her doing. That was Monday morning, and I went to this church. I wasn't looking for her. I was looking for a man, and I called her and told her that I wanted to speak to her, and she said she had him. I would not have killed her for nothing in the world, for I thought a heap of her." Under these circumstances it was held by this court that the law of voluntary manslaughter should have been given in charge by the trial judge.

From the evidence and the defendant's statement in the present case, we think it might have been inferable by the jury that the defendant went to see his wife with the best of intentions, in order to persuade her to return to him; that the defendant was suspicious of his wife and, after leaving the house, he remained around the premises, keeping the house under surveillance; that, after the mother of the deceased had discovered him at a window, he charged that there was a man inside, but this was denied; that the defendant in going around the house glanced through a window and saw -a man inside; that his past suspicions of his wife's conduct were revived and confirmed; that he then returned to the door and demanded admittance, which was refused; that his knowledge of the presence of the man inside, coupled with denials of the fact by those inside the house as well as their refusals to admit him, incensed the defendant and reasonably led him to the conclusion that his wife was carrying on an illicit relationship with the man and had just committed, or was about to commit, adultery; that the discovery of this man inside the house with his wife, under these circumstances, so aroused the defendant's passion that he, while in a heat of passion, secured the axe, pursued his wife and killed her.

While it is true, as urged by counsel for the State, that witnesses "testified that there was not a man in the house at the time," and "there was no evidence supporting the statement of the defendant that he had seen a man through the window," it was for the jury to determine the truth; and if, from the evidence and the defendant's statement there was *anything deducible*

which would *tend* to show that the defendant was guilty of voluntary manslaughter, or which would be sufficient to raise a doubt as to whether the homicide was murder or voluntary manslaughter, the jury should have been instructed on the law of voluntary manslaughter. It was for the jury to determine whether the chain of circumstances and conduct were sufficient to engender irresistible passion. Likewise, the question of cooling time was exclusively for determination by the jury. Code, § 26-1007; *Burke* v. *State,* 196 *Ga.* 702 (27 S. E. 2d, 313), and cit. Accordingly, the trial court erred in failing to charge on the law of voluntary manslaughter as requested.

Special ground 3 is controlled by the preceding ruling. The remaining special ground complains of an excerpt from the charge, where the court undertook to charge the jury as to the defendant's contentions. Since on another trial it is unlikely that this charge will be repeated as given, it is unnecessary to rule upon this ground of the motion.

*Judgment reversed. All the Justices concur, except Bell, J., absent on account of illness.*