## 32826. AGUILAR v. THE STATE.

HALL, Justice.

On this appeal we affirm Aguilar's conviction for the murder of his former wife's second husband.

### Trial Evidence

Aguilar and his former wife, Elvita, had three children of whom she had custody. The state's evidence showed that for some months following the divorce there had been conflict between the parties as Aguilar pressed for more time with his children than the divorce decree allowed him, and manifested jealousy about her remarriage to the victim, D. W. Lunsford. Aguilar still considered her his "wife." On the night of the murder, it had been two days since Aguilar had seen his former wife and Lunsford, and Aguilar at the time had custody of his two older children because the Lunsfords had agreed to his request. He appeared after 11:30 at night at the mill where the Lunsfords worked the graveyard shift, with a loaded gun hidden in his clothes, and asked to speak to Elvita. She appeared, bringing D.W. with her. Her testimony and that of witnesses Long, Witherow, Bowers and Bagley, who also worked at the mill, is in almost perfect agreement on the following description of events: The machines made too much noise for the conversation to be clearly heard, but Aguilar appeared to pull, slap or punch at Elvita; D.W. interposed himself between Elvita and Aguilar at which point Aguilar punched him, being the first of the two men to strike the other. D.W. then landed two hard blows on Aguilar, after which Aguilar bent in some fashion or pushed at his leg and a gun was seen to slide out of his pants leg. Elvita shouted that he had a gun, and D.W. turned and ran. Aguilar shot him in the back from a distance of about 15 or 20 feet, and then followed in the direction he had run, firing twice more at

him.

Other witnesses who had been differently placed in the mill testified that D.W. ran some distance before collapsing on the floor and asking workers to call an ambulance for him. Aguilar then came up to the prostrate D.W., pointed the gun at his head, and definitely appeared to be preparing to shoot him again in the head. Aguilar was then jumped by two workers and the gun went off harmlessly. D.W. was never seen to have any sort of weapon. Police arrived soon after, taking Aguilar into custody. D.W. died shortly thereafter. An autopsy revealed that the fatal bullet entered below the right armpit and made an upward trajectory. There was another bullet wound entirely through the left elbow.

Aguilar's defense consisted of numerous character witnesses who testified to his reputation in the community for good character and truthfulness. He also testified at length for himself, denying large parts of the sequence of events as testified to by the other eyewitnesses, who numbered about 10. He testified that he never hit Elvita or D.W.; that D.W. assaulted him and punched him several times; that as he was doubling up under these blows his gun fell out of his clothes and he was in pain and picked it up, whereupon it went off — whether by accident or by his reflex action, he was unsure. He then fired two more shots toward the back of the fleeing D.W. because he was angry. He then found the fallen man, apologized after a fashion for having had to hurt him, and called three times to bystanders to summon an ambulance.

The jury were charged on self-defense, voluntary manslaughter, and murder, and convicted him of murder for which he was sentenced to life imprisonment.

Enumerations of Error

1. Following publication of the murder verdict, Aguilar chose not to avail himself of his opportunity to poll the jury. Subsequent to trial three persons gave Aguilar their affidavits that they had believed him guilty of voluntary manslaughter, but agreed to a murder conviction because one of the jury stated that voluntary manslaughter probably would not give him enough punishment. These three affidavits were appended to his

new trial motion which was overruled. Aguilar claims in Enumeration 1 that the trial court erred in not allowing the verdict to be successfully impeached by these affidavits.

What goes on in the jury room is a complicated weighing process, in which the final unanimous verdict is merely the resultant of numerous competing forces. See generally H. Kalven & H. Zeisel, The American Jury (1966). Our statute (Code Ann. § 110-109) prohibits the jurors from impeaching their verdicts: "The affidavits of jurors may be taken to sustain but not to impeach their verdict." The purpose of the statute is plainly to prohibit after-the-fact picking at the negotiating positions of the jurors and of their attempts to persuade one another. Nor does the rule primarily benefit the state. Without such prohibition, for example, the state might after an acquittal show that the jurors actually concluded unanimously that the defendant was guilty of the crime charged, but acquitted him because they felt that events had punished him enough. Kalven and Zeisel found that this conclusion that "the defendant has been punished enough" is a recurring consideration in jury deliberations. Our system, which makes the jury the judges of both the law and the facts, is obviously designed to give them great leeway to bring community standards to the jury room.

Aguilar argues that his affidavits should be permitted to show that the jury considered "facts" not in evidence. This was the situation in *Watkins v. State,* 237 Ga. 678 (229 SE2d 465) (1976), in which we allowed a jury verdict to be impeached by jurors' affidavits which detailed active misconduct by two jurors who "made an unauthorized visit to the scene of the crime and gauged the time it took to drive from there to appellant's house." 237 Ga. at 683. This court found that those two jurors had become in effect unsworn witnesses against the accused, in violation of the Sixth Amendment. No such juror misconduct has been shown here. This verdict may not be impeached merely by showing that perhaps not all of the jurors were motivated toward their unanimous murder verdict by exactly the same considerations. The first enumeration of error is without merit. See also *Shouse v.*

*State,* 231 Ga. 716, 716 (203 SE2d 537) (1974); *Bowman v. Bowman,* 230 Ga. 395, 397 (197 SE2d 372) (1973).

2. The evidence detailed above was sufficient to support a jury verdict of murder, and the enumeration raising the general grounds is without foundation.

3. Aguilar's claim in Enumeration 3 that the court erred in refusing his counsel's request to strike one of Elvita's responses on cross examination is similarly without merit. Counsel never indicated any objection except an implied claim of unresponsiveness to the question. The answer was responsive, and was so held by the trial court. Aguilar may not now raise for the first time on appeal a claim that the answer improperly placed his character in issue. (See citations in Division 7, infra.)

4. Aguilar's fourth enumeration appears to have three parts. First, he argues that the recharge on voluntary manslaughter given at the jury's request "to know more about the law of manslaughter" was erroneous because it was inadequate. This argument is incorrect. The recharge covered exactly the same ground as the original charge, and was in almost exactly the same words. In any event " 'the giving of a recharge to the jury as to one issue in the case does not require a recharge in toto.' " *Kesler v. State,* 235 Ga. 251, 253 (219 SE2d 145) (1975).

Answering his second point, at no time did Aguilar request the additional language which he now claims was required to make a portion of the manslaughter charge fit the evidence. The charge as given was approved in *Campbell v. State,* 204 Ga. 399, 402 (49 SE2d 867) (1948) and *Coleman v. State,* 149 Ga. 186, 188 (99 SE 627) (1918) against similar attacks, and was not error.

The remaining claim on this point is that the province of the jury was invaded by the court's charge that provocation by words was always inadequate to reduce murder to manslaughter. This argument overlooks the fact that this charge is embedded in the old statutory law of Georgia. See *Campbell v. State,* 204 Ga. 399, 403 (49 SE2d 867) (1948) (citing former Code § 26-1007, presently subsumed under Code § 26-1102.)

5. Enumeration 5 is plainly without merit and

requires no discussion.

6. Enumeration 6 claims error in the court's failing, without a request, to charge that a witness' testimony may be impeached by showing bias or prejudice. The record is inadequate to support this attempted argument: when defense counsel had the state's witness in question on cross examination, the witness uttered an ambiguous statement that "I'm prejudiced," at which time he was referring to Elvita. The witness never said he was prejudiced against Mexicans (Aguilar is a Mexican-American) and counsel dropped the subject immediately and never pinned down the "prejudice." Moreover, the charge given on impeachment was exactly what Aguilar requested. This enumeration is frivolous.

7. In Enumeration 7, Aguilar argues that the trial court erred in allowing the state to introduce on rebuttal photographs of Elvita's wounds and her testimony that the reason she got on the plane to Michigan was that Aguilar beat her black and blue with a metal reinforced police stick and forced her onto the plane. At trial, the only objection defense counsel raised was that "it is not in the scope of rebuttal." This objection was overruled, and correctly so: Aguilar had testified that he did not force Elvita onto the plane to Michigan, and had in general testified that he was a loving, concerned and benevolent husband and father.

On appeal, Aguilar argues for the first time that this testimony of a specific act of misconduct was erroneously admitted to rebut his evidence of his good character. This argument has been waived because it was not presented to the trial court. Cf. *Bostick v. Ricketts,* 236 Ga. 304, 305 (223 SE2d 686) (1976); *Davis v. State,* 234 Ga. 730, 731 (218 SE2d 20) (1975).

8. Answering Enumeration 8, the trial court was not requested by Aguilar to limit the jury's consideration of the state's rebuttal evidence to impeachment purposes only, nor was he requested to strike it, and accordingly he did not err in failing to do so. Part of the rebuttal was an additional statement by Aguilar; but in his brief here Aguilar contends that it was not in any way impeaching nor inconsistent with his trial testimony. Therefore, any error in the court's nonaction, if any had occurred, was

harmless.

9. These portions of the charge on homicide are attacked as burden-shifting, in Enumeration 9: "I charge you that the law presumes that a person intends to accomplish the natural and probable consequences of his act, and if a person uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily employed to produce death, and causes the death of a human being the law presumes the intent to kill. This presumption may be rebutted * * * [and] if the state proves the defendant killed the person named in the Bill of Indictment in this county by the use of a deadly weapon in a manner likely to produce death, then the killing is presumed to be intentional and malicious, unless as stated, circumstances of alleviation, excuse or justification appear to your satisfaction from the evidence."

In his brief Aguilar twice asserts that these instructions created an "irrebuttable" presumption of malice; but merely reading the charges shows this is incorrect. These charges are quite similar to those we recently upheld against similar attacks in *Patterson v. State,* 239 Ga. 409 (238 SE2d 2) (1977), our recent decision on this point which was not cited by either party here. There, we upheld the charges after carefully considering In re Winship, 397 U. S. 358 (90 SC 1068, 25 LE2d 368) (1970); Mullaney v. Wilbur, 421 U. S. 684 (95 SC 1881, 44 LE2d 508) (1975); Patterson v. New York, 232 U. S. 197 (97 SC 2319, 53 LE2d 281) (1977); and Hankerson v. North Carolina, 432 U. S. 233 (97 SC 2339, 53 LE2d 306) (1977). See also, *Thomas v. State* 240 Ga. 454, 455 (1978).

This jury were at no time charged that the burden rests upon the accused to show justification or mitigation, which was held erroneous in *Jordan v. State,* 232 Ga. 749, 755 (208 SE2d 840) (1974). Moreover, they were specifically charged that malice, either express or implied, is an essential element of murder, and the burden was on the state to show malice beyond a reasonable doubt. Finally, review of the entire record shows that the *state's* evidence did not show any mitigating circumstances, justification or alleviation; therefore, Aguilar's argument based upon an assertion that it did,

is irrelevant.

There is no merit to the argument that the charges as given were burden-shifting.

10. The trial court did not abuse its discretion in failing to charge as requested on Code Ann. § 26-1306, concerning one who is charged with simple assault or simple battery, since such a charge would not have been adjusted to the facts of the case.

Aguilar additionally argues that the court erred in refusing this requested charge; "When one goes to the aid of another person, he may use as much force as the other person could have used to protect himself." The substance of this charge was more amply covered by the charge actually given by the trial court in the language of Code Ann. § 26-902 (a), and no error occurred in refusing the exact words requested. *Jordon v. State,* 232 Ga. 749, 754, supra.

Finally, Aguilar objects to the following jury charge: "I further charge you that if you should find that from the evidence that D. W. Lunsford was coming to the aid of his wife, and there was an assault being committed upon her to such extent that it was a fear in his mind that it was a deadly assault upon her or assault which would cause her harm, then D. W. Lunsford would be authorized to come to her aid. If he was killed in the process by this defendant, if you so find beyond a reasonable doubt, the theory of self-defense is not available to this defendant." He argues that the charge was erroneous because on the evidence here, as a matter of law Lunsford could not reasonably have believed that the assault Aguilar was making upon Elvita could have caused her harm sufficient to justify his intervention. The trial court properly left this fact question concerning the "reasonableness" of the victim's belief to the jury.

All enumerations having been found without merit, the judgment is affirmed.

*Judgment affirmed. All the Justices concur.*

SUBMITTED SEPTEMBER 30, 1977 — DECIDED FEBRUARY 28, 1978.

*William Earl Glisson,* for appellant.

*Charles A. Pannell, Jr., District Attorney, William W. Keith, III, Arthur K. Bolton, Attorney General, Daryl A. Robinson, Staff Assistant Attorney General,* for appellee.