38753. BROOKS v. THE STATE.

GREGORY, Justice.

The defendant was convicted of the murder of his common-law wife and sentenced to life imprisonment. His sole enumeration of error is that the trial court failed to charge, upon written request, the

law of voluntary manslaughter.

The evidence at trial showed that the defendant and victim had been married for seven years. Approximately one month prior to her death, the victim filed for divorce. The defendant subsequently moved into a trailer about a block from the victim's house. According to the testimony of several witnesses, on numerous occasions the defendant publicly pled with the victim to reconcile with him which the victim adamantly refused to do. One witness testified the defendant vowed "he would see [the victim] dead before he'd let her get a divorce." This same witness testified that on the day of the victim's death, she was babysitting for the victim's children. Throughout the day, the defendant telephoned the victim's house, requesting to speak to the victim. When the victim returned from work, the defendant called again; this witness testified, however, that the victim refused to speak to him. The babysitter further testified that shortly thereafter she and the victim walked out of the house. The babysitter realized she had forgotten her medication and returned to the house to get it. When she emerged from the house she saw the defendant shooting the victim. This babysitter testified that the defendant then nudged the victim's body with his foot and stated, "You whore, you won't whore no more."

The victim's fourteen-year-old daughter testified that she watched from several feet away while the defendant approached the victim and opened fire on her. The victim's daughter testified that neither the defendant nor the victim spoke before the defendant shot.

A twelve-year-old friend of the victim's daughter testified that he was in the victim's house immediately prior to the shooting and heard the victim speak to the defendant over the telephone, calling the defendant by name. According to this witness, the victim told the defendant she did not have time to talk to him because "she was going on a hot date."

Bruce Hampton, who lived two houses away from the victim, testified that a week prior to the shooting, the defendant approached him and asked to borrow his .22 automatic rifle. The defendant explained that "one of the [victim's] boyfriends was bothering him"; the defendant returned the gun to Hampton the following day without further explanation. At trial Hampton testified that "about 15 or 20 minutes" before the shooting occurred the defendant borrowed his rifle again. Several minutes later, he testified, he heard the defendant and victim "hollering" at each other "in angry voices." He heard the defendant yell at the victim, "you won't whore around on me no more" and began firing. The defendant then attempted to return the rifle to Hampton, but Hampton refused to accept it.

Several neighbors testified that, following the shooting, the defendant appeared to be "a wild man." His eyes were "glazed over" and he was "berserk," screaming that "they were going to kill [him]."

A patrolman from the East Ridge Police Department testified that when he arrived to apprehend the defendant, he found the defendant in a "highly excited" state. The defendant spontaneously stated "I killed her . . . she just drove me to it." The patrolman testified the defendant further stated that the victim had called him, "bragging about . . . her sexual activities with another gentleman." A deputy sheriff testified that when he arrived on the scene, the defendant told him that he had gone to the victim's house with the intention of scaring her with the rifle but that when she began taunting him with a graphic description of her sexual activities with other men, he shot her.

Two other witnesses were permitted to testify that, on several occasions prior to the shooting, they had heard the victim publicly taunt the defendant about the specifics of her sexual activities with other men.

The medical examiner who performed the autopsy on the victim testified that she had been shot "a minimum of five" times.

(1) Code Ann. § 26-1102 provides, in part, "[a] person commits voluntary manslaughter when he causes the death of another human being, under circumstances which would otherwise be murder, if he acts solely as the result of a sudden, violent and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person . . ." We agree with the defendant that the evidence presented in this case shows sufficient "serious provocation" to authorize a charge on voluntary manslaughter. *Raines v. State,* 247 Ga. 504 (1) (277 SE2d 47) (1981). " 'On the trial of a murder case, if there be any evidence, however slight, as to whether the offense is murder or voluntary manslaughter, instruction as to the law of both offenses should be given the jury.' " *Henderson v. State,* 234 Ga. 827, 832 (218 SE2d 612) (1975); *Raines,* supra, at 506.

The State argues, however, that the trial court did not err in refusing to charge the law of voluntary manslaughter, reciting that portion of former Code Ann. § 26-1007 which stated that "provocation by words, threats, menaces or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder." This statutory provision was interpreted to mean that provocation by words alone was insufficient to reduce a homicide from murder to voluntary manslaughter. *Campbell v. State,* 204 Ga. 399 (49 SE2d 867) (1948); *Coleman v. State,* 149 Ga.

186, 188 (99 SE 627) (1919); See also, Kurtz, *Criminal Offenses in Georgia,* p. 156 (1980). This court has held that this rule, while not made an express provision of Code Ann. § 26-1102, remains a part of the current law of voluntary manslaughter. *Aguilar v. State,* 240 Ga. 830, 833 (242 SE2d 620) (1978).

We agree with the view that words alone, regardless of the degree of their insulting nature, "will [not] in any case justify the excitement of passion so as to reduce the crime from murder to manslaughter, where the killing is done *solely on account of the indignation aroused by the use of opprobrious words.*" (Emphasis supplied.) *Coleman v. State,* supra, at 188. In this case, however, the defendant's indignation was not aroused merely by the victim's fusillade of insulting and vulgar words, but by the victim's adulterous conduct with which she taunted him prior to the shooting. While it is true that the victim used words to make the defendant aware of her adultery, we find the defendant's adulterous conduct rather than the words describing this conduct served as the "serious provocation sufficient to excite . . . a sudden, violent and irresistible passion." Code Ann. § 26-1102. Cf. *Burger v. State,* 238 Ga. 171 (231 SE2d 769) (1977); *Clark v. State,* 158 Ga. App. 77 (279 SE2d 315) (1981).

*Judgment reversed. All the Justices concur, except Jordan, C. J., Smith and Weltner, JJ., who dissent.*

DECIDED JUNE 29, 1982.

*William M. Phillips,* for appellant.

*David L. Lomenick, District Attorney, Roland L. Enloe, Jr., Assistant District Attorney, Michael J. Bowers, Attorney General, Virginia H. Jeffries, Staff Assistant Attorney General,* for appellee.