## 39612. MINCEY v. THE STATE.

MARSHALL, Presiding Justice.

The defendant, Terry Mincey, was convicted in Bibb County for the offenses of murder, armed robbery and aggravated battery. The death penalty was imposed for the murder. This case was tried and is reviewed under the Unified Appeal Procedure. We affirm.

1. Appellant does not attack the sufficiency of the evidence supporting his convictions. This court, however, has nonetheless reviewed the evidence pursuant to Rule IV (B) (2) of the Unified Appeal Procedure. The evidence can be summarized as follows.

Robert Jones, Timothy Jenkins and the defendant met in the

evening of April 12, 1982, and discussed committing a robbery. Each was armed, Jones with a .12 gauge shotgun, Jenkins with a .38 caliber pistol and the defendant with a .380 caliber semi-automatic Llama pistol. After several possibilities were discussed and rejected, the trio drove by a Mini Food Store located at the intersection of Houston Avenue and Hartley Bridge Road in Bibb County. They circled back to the store and parked. The defendant entered the store briefly and returned to the car. He told the others that there were only a female clerk and two teenagers inside and it looked like a good place to rob. He informed the others that he did not plan on leaving any witnesses. When Jenkins protested, the defendant told him, "If you're talking about not wasting nobody, you're in the wrong . . . car." They waited, hoping the kids would leave. When, after a few minutes, they did not, the defendant reentered the store. Jenkins positioned himself outside, between the ice machine and the dumpster. Jones, the driver, stayed in the car.

Fourteen-year-old Mischell Cook and her 15-year-old brother, "Bubba," were inside the store, visiting the cashier, Mrs. Riggs. When the defendant entered the store, they recognized him as the same young white male who had entered the store 10 or 15 minutes previously. He told Mrs. Riggs to "put the money in the bag" and told the kids to go to the car.

Jenkins, standing outside, saw two teenagers walk out of the store just as a pick-up truck pulled up to the gas pumps. The driver, Russell Peterman, got out and began to fill his tank. Meanwhile, Mrs. Riggs, followed by the defendant, exited the store. When the defendant saw Peterman at the gas pumps, he turned Mrs. Riggs over to Jenkins and walked toward the pumps.

Peterman testified that as he was pumping gas, he was confronted by a young white man with a pistol in his hand, who said, "come go with me." Peterman was so suprised that he failed to respond. The man said, "You think I'm joking, don't you?" Then he shot Peterman in the chest. Peterman fell to the ground, and the man walked over and shot him in the face.

When this happened, Jenkins proceeded toward the getaway car and the teenagers ran. Jones, sitting in the car, saw Mrs. Riggs run after them, but she ran too late. The defendant came back across the parking lot and fired at her. Jones saw Mrs. Riggs grab her neck and fall behind the dumpster. The defendant walked behind the dumpster and bent down. Jones heard a second shot.

The defendant ran to the car, got in, and they left. They counted the money taken from the store — about $40. Jones asked if the victims were dead. The defendant answered, "Yes, they are dead. I know they are dead, I shot both of them." Then the defendant asked

where the kids were. When he found out they had escaped, he said, "Well, I just got a death sentence."

Jones' car was a multi-colored Mustang with mag wheels, no hood, one working headlight and a loud muffler. When police arrived at the scene a few minutes after the robbery, witnesses were able to describe the car and identify its owner. Jones was soon located and placed under arrest. After he named the defendant as a participant, officers went to the defendant's residence and placed him under arrest. The defendant thereafter admitted to law enforcement officers that he had shot Peterman and Mrs. Riggs.

Mrs. Riggs died. An autopsy revealed that she had been shot twice. One bullet entered her left ear, went through her head, and lodged in her right cheek. This bullet was recovered. The other entered the right side of her head through the temporal bone (driving bone fragments into her brain), deflected, and exited on the right side of her neck. This bullet, which inflicted the fatal wound, was not recovered.

Peterman lived. One bullet entered his chest and lodged in a muscle close to his spine, where it remains. The other bullet entered the left side of his head and travelled across his face. Two weeks after he was shot, his condition had stabilized sufficiently that this wound could be operated on. The bullet was removed from under his right eyebrow. His left optic nerve was damaged by the passage of the bullet and he is now totally blind in his left eye. His right eye suffered severe retinal damage and has a drooping upper lid, which may or may not eventually elevate on its own. With the lid lifted out of the way, his right eye has approximately 40% of its original vision.

A .380 Llama pistol was recovered from the defendant's trailer. Ballistics examination showed it to be the pistol which had fired the bullets recovered from Peterman and Mrs. Riggs.

The evidence presented was more than sufficient to support the verdicts of guilty. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The defendant filed a pre-trial "motion challenging death qualification of jurors during voir dire." In the motion, the defendant alleged that the practice of excusing, for cause, potential jurors who are unalterably opposed to the death penalty denies a defendant his right to a jury drawn from a fair cross-section of the community, results in a jury more likely to convict than one not "death-qualified," and violates a defendant's right to equal protection because death qualification only occurs in death penalty cases. No evidence was presented on this motion. At a pre-trial motion hearing conducted pursuant to Rule II (B) of the Unified Appeal Procedure, the court announced, before any evidence was proffered on behalf of this

motion, that it was denied.

The defendant does not contend that his Sixth Amendment fair-cross-section challenge or his equal-protection challenge to the practice of death qualification of jurors presented any factual questions requiring the presentation of evidence. He contends, however, that Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), impliedly entitles him to an evidentiary hearing with regard to his contention that death-qualified juries are more likely to convict than non-death-qualified juries.[1] The failure of the court to conduct such an evidentiary hearing, appellant argues, was reversible error.

We cannot agree. In the first place, had the court erred by refusing to conduct an evidentiary hearing, the error could be cured by a remand for an evidentiary hearing. Only if the defendant prevailed at that hearing (an unlikely event, as will hereinafter be demonstrated) would reversal be required. Second, in view of the defendant's failure to proffer any evidence in support of this motion, it is less than clear that an evidentiary hearing was, in fact, denied. Most importantly, had the defendant been allowed to present evidence that death-qualified juries are more likely to convict than non-death-qualified juries, and had this evidence "suppl[ied] the persuasiveness found lacking by the Supreme Court and by many other courts, both federal and state, since *Witherspoon*," the defendant still would not have been entitled to the relief sought. Smith v. Balkcom, 660 F2d 573, 578 (5th Cir. 1981); Spinkellink v. Wainwright, 578 F2d 582 (5th Cir. 1978). In each of these cases, the Fifth Circuit assumed, without deciding, that a death-qualified jury is more likely to convict than a non-death-qualified jury and held that, nonetheless, the practice of excluding for cause those potential jurors so unequivocally opposed to the death penalty that they would

---

[1] The United States Supreme Court rejected Witherspoon's argument "that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence." 391 U. S., supra, at 517. "The data adduced by the petitioner," the court stated, "are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt." Ibid. The court noted, however, that "a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt*. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence." 391 U. S. at 520 (n. 18). This language is the basis for the defendant's claim of entitlement to an evidentiary hearing. However, as noted in Smith v. Balkcom, infra, "[t]his passage can hardly be construed as a mandate that . . . courts hold such a hearing . . ." 660 F2d at 578 (n. 10).

automatically vote against it, no matter what the evidence might reveal, does not deny a defendant his constitutional right to an impartial jury.

As the state suggests, "[t]he attack upon the death qualification of jurors as producing conviction-prone juries is past the stage of old hat, and has now become merely a part of the familiar repertoire of death defendants, a sort of 'golden oldie' of death penalty attacks." A plethora of United States Supreme Court, Fifth Circuit and Georgia cases have upheld the practice of excusing jurors who are so unalterably opposed to the death penalty that they could never impose it in any case. The trial court did not err by summarily overruling the defendant's challenge to this practice. The defendant's second enumeration of error is meritless.

3. The trial court did not err by overruling the defendant's challenge to the constitutionality of Georgia statutes relating to the imposition of the death penalty. He argues that Georgia law improperly allows the state to prove non-capital felonies in aggravation during the sentencing phase of the trial and gives too much discretion to the jury. Citing our response to a question certified to us by the United States Supreme Court (*Zant v. Stephens,* 250 Ga. 97 (297 SE2d 1) (1982)), the defendant contends that the premises underlying our statutory scheme for the imposition of the death penalty will not withstand constitutional scrutiny. Since the defendant submitted his brief, however, the United States Supreme Court has resolved these contentions adversely to the defendant. Zant v. Stephens, —— U. S. —— (103 SC 2733, 77 LE2d 235) (1983). Thus, the defendant's third enumeration of error is meritless.

4. Prior to trial, the defendant sought funds to pay for the services of expert witnesses to testify on behalf of his challenge to electrocution as a means to carry out the death penalty. The trial court refused to supply these funds and subsequently overruled the challenge.

We have previously rejected contentions that electrocution is a cruel and unusual punishment. *Nelson v. State,* 247 Ga. 172 (18) (274 SE2d 317) (1981); *Collier v. State,* 244 Ga. 553 (18) (261 SE2d 364) (1979). The trial court did not abuse its discretion by refusing to fund a renewed challenge to the Georgia method of carrying out death sentences, *Wilson v. State,* 250 Ga. 630 (2 c) (300 SE2d 640) (1983), or by overruling the challenge.

5. An attorney was appointed for the defendant on April 13, 1982, the day after the offense. Some time prior to May 6, an additional attorney was appointed for the defendant. On May 6, the court heard the defendant's motion for investigative assistance. The motion alleged only a general necessity for assistance to interview

witnesses. The trial court noted that the defendant was represented by two attorneys and denied the motion. The court did state, however, that its denial was not final and the motion could be renewed any time the defendant could demonstrate a need for assistance. The defendant made no further requests for investigative assistance. The trial began in the latter part of August 1982.

In these circumstances, the court's refusal to award funds for investigative assistance was not an abuse of discretion. *Wilson v. State,* supra, (2 b); *Rivers v. State,* 250 Ga. 303 (5) (298 SE2d 1) (1982). The defendant's eleventh enumeration of error is meritless.

6. The defendant's sixth, seventh and eighth enumerations of error relate to the legality of his arrest and the subsequent custodial interrogation and search of the defendant's trailer.

The events leading up to the arrest of the defendant began, for our purposes, shortly after 11:00 p.m. with the arrival of law enforcement officers at the crime scene. Investigators soon obtained a description of the getaway vehicle and ascertained that Jones was its owner. Jones was located and arrested at 2:30 a.m. As he was being transported to the Law Enforcement Center in Bibb County, Jones admitted his part in the robbery and named the defendant as another participant. This information was relayed to the Bibb County sheriff's office. Upon his arrival at the LEC, Jones was questioned. By 4:00 a.m., he had given a detailed statement consistent with information that had been obtained from other witnesses, including Peterman and the two teenagers in the store. In addition, officers obtained from Jones a description of the defendant's motorcycle and his telephone number, which they traced to Hill-N-Dale trailer park. At 4:30 a.m., Macon police officer Mack Brown located the defendant's trailer. Soon afterward, other officers began to arrive.

While they were watching the trailer, a woman came out. She identified herself to the officers as the defendant's mother, Mrs. Mincey, and told them she was going next door to see a friend. When asked if the defendant was inside, she answered that he was and she thought he was asleep. She told the officers which bedroom she thought he was in.

The sheriff arrived at approximately 4:45 or 4:50 a.m. He talked briefly with Officer Brown, who told him that the defendant was inside and that Mrs. Mincey had gone next door. At the sheriff's suggestion, Brown went to the neighbor's trailer and requested Mrs. Mincey's assistance in calling her son. She dialed the number and, when the defendant answered, gave the telephone to Brown. Then, according to Brown, "I . . . asked him to come outside. [The defendant] asked me why I wanted him to come outside and I told

him he had become a suspect in a homicide and an armed robbery, and to please come on out right now." The defendant did, and was arrested in his front yard at 4:56 a.m.

After the arrest, another officer entered the trailer to see if anyone else was there. This officer testified that he did not remain inside the trailer for over a minute. No further search was conducted at this time. Later in the day, a search warrant was obtained and the trailer searched. With Mrs. Mincey's assistance, the defendant's .380 Llama pistol was found under the bathroom sink.

The defendant contends that the warrantless arrest was illegal and that his custodial statements and the pistol were fruits of the illegal arrest. He further contends that his custodial statements were not voluntary.

(a) The defendant concedes that his arresting officers had probable cause to make the arrest. We agree. At the time of the arrest, "the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the accused had committed . . . an offense. [Cit.]" *Durden v. State,* 250 Ga. 325, 326 (297 SE2d 237) (1982). The defendant contends that the arrest was nonetheless illegal because the requirements of OCGA § 17-4-20 (a) (Code Ann. § 27-207) (pertaining to warrantless arrests) were not met. This contention is answered adversely to the defendant by *Durden v. State,* supra, wherein we held that an arrest, "legal under federal law, [is] legal under state law." Id. at 327.

The question, then, not really addressed by the defendant, is whether his arrest was legal under federal law. In United States v. Watson, 423 U. S. 411 (96 SC 820, 46 LE2d 598) (1976), the United States Supreme Court upheld a warrantless arrest in a public place where the arresting officer had probable cause to believe the suspect was a felon. However, the court subsequently held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Payton v. New York, 445 U. S. 573, 576 (100 SC 1371, 63 LE2d 639) (1980). Thus, since Payton, a warrantless arrest may be made inside a suspect's home only with his consent or under exigent circumstances.

We need not determine whether exigent circumstances existed. The defendant was telephonically requested to exit his home and voluntarily did so. His arrest, outside his home, by officers who had probable cause to believe that he had participated in an armed robbery and had murdered one person and severely injured another, was constitutionally valid. See United States v. Ruiz-Altschiller, 694 F2d 1104 (II A) (8th Cir. 1982); United States v. Costa, 691 F2d 1358

(II) (11th Cir. 1982); United States v. Johnson, 626 F2d 753, 755-757 (9th Cir. 1980).

(b) The defendant does not attack the validity of the search warrant. His only contention regarding the search is that it was the product of an illegal arrest and that the evidence obtained in the search should therefore have been suppressed. Since we have held that the arrest was not illegal, this contention is meritless. Nor was the search warrant a "fruit" of the brief entry of appellant's trailer after his arrest, assuming, arguendo, that this entry was illegal. Wong Sun v. United States, 371 U. S. 471 (83 SC 407, 9 LE2d 441) (1963).

(c) After hearing the evidence, the trial court found that the defendant had been advised several times of his rights under Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), that he understood those rights, that he had freely and voluntarily waived those rights, and that his subsequent statements were freely and voluntarily made. "These determinations by the trial court were not clearly erroneous and we must therefore accept them. Rose v. State, 249 Ga. 628 (2) (292 SE2d 678) (1982)." Brown v. State, 250 Ga. 66, 75 (8) (295 SE2d 727) (1982).

7. The defendant's ninth and tenth enumerations of error relate to the composition of his grand and traverse juries. He contends that young people between 18 and 23 years of age are underrepresented on Bibb County grand and traverse juries.

To prevail on a challenge to jury composition under equal-protection doctrine, Sixth Amendment doctrine, or under OCGA § 15-12-40 (Code Ann. § 59-106), a defendant "must establish prima facie that a distinct and identifiable group in the community is substantially underrepresented on the jury venire being challenged." Wilson v. State, 250 Ga., supra, at 635 (3 a). Appellant has failed to demonstrate that persons between the ages of 18 and 23 constitute a "distinct and identifiable group in the community." See, e.g., Bowen v. State, 244 Ga. 495 (4) (260 SE2d 855) (1979). The defendant's ninth and tenth enumerations of error are meritless.

8. In enumerations of error 14 through 18, the defendant contends that the trial court erroneously excused five jurors in violation of Witherspoon v. Illinois, supra. The excusal of three of these jurors requires no extended discussion. These three prospective jurors clearly and unambiguously stated that they would vote against the death penalty regardless of what transpired at trial. The defendant attempted to rehabilitate these jurors by asking whether or not they could "consider" the death penalty. "It is not sufficient that the juror be willing to 'consider' the death penalty if he or she is committed to automatically vote against the death penalty after having 'considered' it." Cofield v. State, 247 Ga. 98, 103 (2) (274 SE2d

530) (1981). These jurors were so committed and their excusal was not error.

The other two prospective jurors were Ms. Leckie and Mr. Pate:

(a) In response to questioning by the assistant district attorney and the court, Ms. Leckie unambiguously stated that she was conscientiously opposed to the death penalty and had made up her mind prior to trial to vote against the death penalty regardless of the facts and circumstances that might be presented at trial. In response to further questioning by counsel for the defendant, Ms. Leckie indicated she could consider the death penalty. The court then asked her if she was saying "that there are circumstances under which you could return a verdict of death?" She replied, "I suppose only if God told me to, and I have been talked to by God." The court asked, "Ms. Leckie, would your conscience ever allow you to return a death penalty in any case?" She answered, "Only under that circumstance."

The trial court, after consideration, granted the state's challenge for cause. The court reasoned: "Her conscience now says that she can't vote ever for the death penalty. The question is not whether at some point in the future God may speak to her and say, 'Your conscience should now favor the death penalty.' The question is whether under the evidence in this case — under any state of the evidence — and whether under the charge of the court she could return the death penalty, and I think she said the answer was no . . . [S]he said that . . . her conscientious objection, would have to disappear for a reason other than any evidence that might appear and the charge of the court, and legally I believe that does not satisfy the criteria . . . I excuse her for cause."

The record supports the trial court's interpretation of Ms. Leckie's responses, and we agree with the court's reasoning. We find no error in the court's excusal of Ms. Leckie.

(b) In response to the questions of the assistant district attorney, Mr. Pate stated that if the defendant were found guilty, he could impose the death penalty. Then the following transpired:

"MR. THORPE [for the state]: All right, sir. So then you're not opposed to capital punishment, is that correct?

"JUROR: Not in that particular instance.

"MR. THORPE: Well —

"JUROR: Not if it's a sentence of life imprisonment."

Following this indication that the juror did not understand the meaning of the phrase, "capital punishment," the assistant district attorney asked Mr. Pate several times if he could under any circumstances vote for the "electric chair." The juror stated unequivocally that he did not believe in the electric chair and would

not under any circumstances vote for it.

Then the defendant's attorney questioned Mr. Pate, and the voir dire ended as follows:

"MR. COOK [for the defendant]: I want you to imagine yourself on a jury and tell us if there is any case, however bad, that you can think of where you would consider voting for the death penalty?

"JUROR: If it was life in prison, I could.

"MR. COOK: No, we're talking about voting for the death penalty.

"JUROR: No, sir."

The state challenged the juror. The court ruled, "I think it's obvious that Mr. Pate would never consider anything other than life imprisonment. He is excused for cause." We find no error.

9. In his thirteenth enumeration, the defendant contends that the trial court erred by excusing juror Dixon for cause.

In response to the statutory voir dire questions, see OCGA § 15-12-164 (Code Ann. §§ 59-806, 59-807), Ms. Dixon stated that she had known the defendant's parents for years, that at one time the defendant's father had been the pastor of her church, and that she did not feel that she could be a fair and impartial juror. She said, "I know the parents and I know them well [and] I do not wish to be in a position that I'm in now." She asked to be dismissed. Upon further questioning by the defendant's attorney, she unequivocally stated that if she were selected as a juror she could not decide the case based upon the evidence and the law and that under no circumstances could she return a verdict of guilty.

The trial court did not err by granting the state's challenge to this juror. Compare *Jordan v. State,* 247 Ga. 328 (6) (276 SE2d 224) (1981).

10. In enumerations of error 12 and 19, the defendant contends that the trial court erred when it refused to excuse two potential jurors because of their predisposition to impose the death penalty. We find no error. Both jurors stated that their preconceived notions could be laid aside and that they would wait until the evidence was presented to decide what sentence might be appropriate. They both said they could fairly consider both possible sentences for the defendant. It is clear from their answers that neither juror was committed to automatically vote for the death penalty if the defendant was convicted. Thus, the trial court was not required to excuse them for cause, and these two enumerations of error are without merit.

11. In his twentieth enumeration, the defendant contends that the trial court erred by admitting, over objection, a photograph of the deceased, Mrs. Riggs, which showed her and her two children. The

defendant contends that the inclusion of the children in the photograph rendered it inflammatory.

When the defendant objected to the photograph, the district attorney responded that he needed to prove the identity of the victim and that the jury could compare this picture with the autopsy photographs and conclude that the deceased was in fact Mrs. Riggs. He informed the court that he preferred not to ask Mr. Riggs to identify his wife from the autopsy pictures and that there were no pictures available which showed Mrs. Riggs in life that did not also show her children.

The rule announced in *Brown v. State,* 250 Ga. 862 (5) (302 SE2d 347) (1983), is inapplicable here. Thus, the defendant's objection is answered by *Ramey v. State,* 250 Ga. 455, 456 (1) (298 SE2d 503) (1983), wherein we held: "Photographs which are relevant to any issue in the case are admissible even though they may have an effect upon the jury."

12. In his twenty-first enumeration, the defendant contends that the trial court erred by admitting hearsay evidence to explain conduct when that conduct was not in issue.

A police officer was allowed to testify over objection that Jones admitted to him that, "he was part of the robbery and that . . . Terry Mincey [was] . . . involved; and that Terry Mincey had been the triggerman . . ." This testimony was offered to explain why the defendant was later arrested. The trial court instructed the jury that the officer's testimony was not admissible to prove the truth of what Jones told the officer, but only to explain why the officer might have taken some action as a result of having been told this. See OCGA § 24-3-2 (Code Ann. § 38-302).

In *Momon v. State,* 249 Ga. 865, 867 (294 SE2d 482) (1982), this court adopted the following rule: "When, in a legal investigation, the conduct and motives of the actor are matters concerning which the truth must be found (i.e., are relevant to the issues on trial), then information, conversations, letters and replies, and similar evidence known to the actor are admissible to explain the actor's conduct. [Cits.] But where the conduct and motives of the actor are not matters concerning which the truth must be found (i.e., are irrelevant to the issues on trial) then the information, etc., on which he or she acted shall not be admissible under [OCGA § 24-3-2 (Code Ann. § 38-302)]."

Whether it is necessary for the state to explain why a defendant was arrested at the time, the place and under the circumstances shown, depends upon the facts of the particular case. See *Gaskins v. State,* 250 Ga. 386 (297 SE2d 729) (1982). In this case, the defendant made certain admissions following an arrest which he later

contended was illegal. See Division 6, ante. Although the court found the custodial statements to have been voluntarily made, there remained "a question for the jury to determine on conflicting evidence whether the alleged [statements were] freely and voluntarily made." *Cofield v. State,* 247 Ga. 98, supra, at 109 (citing Sims v. Georgia, 385 U. S. 538 (87 SC 639, 17 LE2d 593) (1967)). In these circumstances, we cannot say that the conduct and motives of the officer to whom Jones made a statement were not "matters concerning which the truth must be found." Hence, the trial court did not err by allowing the officer to testify as to Jones' statements in order to explain his subsequent conduct.

In any event, since the testimony was later fully corroborated by the testimony of Jones himself, any error was clearly harmless. *Gaskins v. State,* supra.

13. Co-defendants Jones and Jenkins testified at the defendant's trial. They were extensively cross-examined by the defendant concerning the terms of their plea bargains.[2] For example, the defendant asked Jenkins, "You know the state can take into consideration your testimony here today in recommending a sentence to the court on the battery charge, don't you? . . . And you are here today testifying against [the defendant] to fulfill your end of the plea bargain, aren't you?" He asked Jones, "Is that why you are here today testifying, Mr. Jones, to avoid the without-parole provision of the Habitual Offender Statute?"

The state's response to this line of questioning was to show that these witnesses had given statements, consistent with their trial testimony, before any discussions had taken place with regard to entering pleas of guilty. In his twenty-second and twenty-third enumerations of error, the defendant contends that the court erred in allowing these references to prior consistent statements. We find no error. " 'If an attempt be made to discredit a witness on the ground that his testimony is given under the influence of some motive prompting him to make a false or colored statement, he may be allowed to show in reply that he made similar declarations at a time when the motive imputed to him did not exist.' [Cits.]" *Fuller v. State,* 197 Ga. 714, 718 (2) (30 SE2d 608) (1944). See also, *Jones v. State,* 243 Ga. 820 (2) (256 SE2d 907) (1979).

---

[2] Jones had pled guilty to murder, armed robbery and aggravated battery. He received a life sentence for the murder and 10 years for the aggravated battery. At the time of the trial, he had not been sentenced for the armed robbery. The state dropped the murder charge against Jenkins. He pled guilty on the other two counts, received a life sentence for the armed robbery and had not been sentenced for the aggravated battery.

14. In his twenty-fourth enumeration of error, the defendant complains of the emphasized portion of the following argument by the district attorney occurring during the guilt-innocence phase of the trial:

". . . Have we done anything wrong? Is it wrong to encourage people who see a murder to come into court and tell the truth? Now, Mr. Daniel has brought out what the sentences are. Mr. Jones has been sentenced to life. That's an irrevocable and final sentence. He has been sentenced to 10 years consecutive to that. That's a final and irrevocable sentence. But on the other count, his sentence is open. And I'm sure Mr. Jones hopes that by the testimony he gave yesterday that the judge, who controls his final sentence, will give him some consideration for coming in here and telling the truth. Anything wrong with that?

*"Is there anything wrong with a judge or a district attorney making a recommendation that would say that at least on the third count of these three counts a man who comes in and tells the truth should get somewhat better treatment than a man who refused to tell the truth?* Nothing sinister about that — unless, unless in an effort to improve their own positions Jones and Jenkins came in here and told something different, changed their stories to come in here and make some deal. Now, I would agree with Mr. Daniel. So you have to ask yourself the question: Did Jones and Jenkins change their stories and come in here and make accusations against this poor man to make themselves a deal? . . ."

The defendant concedes that the argument was not a direct reference to the defendant's failure to testify, but contends that it was improper because it might have been construed as such by the jury. See *Ranger v. State,* 249 Ga. 315 (3) (290 SE2d 63) (1982). The defendant, however, failed to interpose a timely objection to the argument; thus, this court has nothing to review. *Rivers v. State,* 250 Ga., supra, at 308 (7); *McAllister v. State,* 231 Ga. 368 (1) (202 SE2d 54) (1973).

15. The defendant contends, in his twenty-fifth enumeration, that the trial court erred by allowing the state to conduct an improper redirect examination of a witness.

" 'Redirect examination and recross are strictly speaking, not for the purpose of introducing new matter, but the judge in his discretion may permit the questioner to inquire about something which he should have asked about during an earlier step but which was overlooked.' Green, Ga. Law of Evidence 317, Witnesses, § 126; [cits.]." *Goodrum v. State,* 158 Ga. App. 602 (2) (281 SE2d 254) (1981). "The trial judge, in his discretion, found the evidence brought in on re-direct examination to be relevant and admissible. Absent a

showing of gross abuse of discretion, we find no error. [Cits.]" *Maher v. State,* 239 Ga. 305, 306 (2) (236 SE2d 647) (1977).

16. In his twenty-sixth enumeration of error, the defendant complains that the state's pre-trial discussions with three potential defense witnesses diminished their willingness to testify in mitigation during the sentencing phase of the trial. The state's misconduct, the defendant contends, and the resulting "chilling effect" on these potential witnesses, amounted to "outrageous prosecutorial overreaching," requiring a retrial as to sentence. Evidence was presented on behalf of this contention at the defendant's motion for new trial.

(a) Geri Willis, who had three forgery convictions, was a former girl friend of the defendant. She was interviewed prior to trial by investigators from the district attorney's office and later by the district attorney and one of his assistants. At this interview, Ms. Willis told the prosecutors: (1) that, when the defendant was about to be released from prison, he asked her to bring him a gun, because he wanted her to help him rob a bank in Pearson, Georgia; (2) that he had asked her to help him rob her own mother and father; (3) that he once broke her jaw, because she put the wrong dressing on his salad; (4) that the defendant had told her that, as a child, he liked to set cats on fire and to bury them up to their necks and run over them with a lawn mower; and (5) that the defendant felt he had made a mistake in the past by leaving witnesses behind and had said that, in the future, when he committed an armed robbery, he would kill all the witnesses, including his co-robbers.

Ms. Willis testified at the hearing on the motion for new trial that this interview lasted until 4:00 p.m., causing her to miss a scheduled appointment with defense attorney Rick Cook. She did, however, talk to Cook's partner, John Schaffer, to whom she was hostile, because the assistant district attorney had characterized Cook as a "smooth talker" who would try to convince her to "go for the defense."

Assistant district attorney Thorpe testified that he told Ms. Willis that she could talk to Mr. Cook if she wanted to, but that she did not have to. If she did talk to him, she should tell him the truth and not lie as she did when she first talked to investigators from the district attorney's office.

Defense attorney Cook testified that Ms. Willis had made some statements to Schaffer that were inconsistent with what she had told Cook in several pre-trial telephone conversations and in one face-to-face conversation prior to the commencement of the sentencing phase of the trial. Cook testified that he had checked with other persons who knew Ms. Willis, and, from these conversations,

from his own discussions with Ms. Willis and from Schaffer's report of his interview with her, had concluded that she was unstable. He decided not to use her as a witness. (The state did not use her either.)

The only thing to which Ms. Willis might have testified in mitigation was her observation that the defendant had undergone a personality change after a motorcycle accident in 1980. We note that the defendant committed three armed robberies in 1977, three years prior to his motorcycle accident. On one of these occasions, a strange car pulled into the parking lot of the convenience store being robbed. The defendant fired several shots at it, later observing that the driver "didn't have any business out that time of night, anyway."

We agree with the trial court that no prosecutorial misconduct was shown as to this witness and that, in any event, her testimony would have been more harmful than helpful.

(b) Prior to trial, Cassie Mitchell and her husband, Jessie James Mitchell, were asked to come to the district attorney's office by assistant district attorney Thorpe. Thorpe had talked to Cassie earlier that day and she had been cooperative. When she returned with her husband, Jessie informed Thorpe that he had been convicted of statutory rape and did not intend to help "the law." Thorpe asked him if he would refuse to help even if he had relevant evidence that would tend to prove that the defendant was guilty of murder. Jessie answered that he would not tell Thorpe anything unless it would help the defendant. Thorpe, at this point, gave Jessie a "ten-minute opening-statement-type summary of the evidence" against the defendant, describing, among other things, how Mrs. Riggs had been killed, and mentioning that she had left small children behind. Thorpe showed Jessie some of the crime-scene photographs.

Jessie and Cassie both testified that this presentation had an effect on them. Jessie had previously doubted that the defendant was guilty. He testified that, after Thorpe's presentation, he became convinced of the defendant's guilt and was no longer willing to help the defendant avoid the death penalty. He cooperated with Thorpe and confirmed that he and Cassie had gone to see the defendant in jail and asked him why he "did it," and that the defendant's only response had been, "Acid City." Cassie testified that, after she heard Thorpe's presentation, she thought the defendant "should burn."

Jessie testified at the hearing on the defendant's motion for new trial that, if he had been called as a defense witness at the sentencing phase of the trial, he could have testified that the defendant had told him to quit drinking and get a job, and that the defendant had good character. Defense attorney Cook conceded that he did not know

whether he would have used Jessie as a defense witness.

Cassie testified that, after she heard that the defendant received the death penalty, she felt guilty that she had not contacted the defense prior to trial and had not testified on the defendant's behalf. She testified that his girl friend, Geri Willis, had told a lot of lies and had hurt the defendant. She had written bad checks "against him" and had lied about a job opportunity in Virginia. When Cassie had been pregnant and her husband was in prison, the defendant had tried to help her and had loaned her some of his mother's clothes, bedspreads and silverware (without his mother's knowledge). She once talked to the defendant about an illegitimate child that might have been the defendant's. The defendant told her, "Well, if you see [the mother] and if she thinks I'm the father of that child, you tell her that I'll help support it, because one thing I am, you know, I'm a man, I'm going to support my children." Cassie suggested that there were two types of ex-convicts: those who were going back to prison, and those who were "going to make it." She said, "Terry [Mincey] was going to make it. He had that attitude; it was get out, let's get a job, let's be somebody, let's hold our heads up, let's start all over."

The defendant contends that only because of Thorpe's dramatic presentation was Cassie unwilling to come forward as a defense witness prior to trial. The record suggests otherwise.

Geri Willis called Cassie prior to trial and told her that the defendant had threatened to kill Cassie if she testified against him. Cassie thereafter contacted Thorpe and told him she wanted no part of the case; she was afraid of the defendant. There had been, moreover, an earlier incident in which the defendant had come to Cassie's place of employment brandishing a knife. She left by the back door and went to a restaurant. An hour or so later, the defendant appeared at the restaurant, still brandishing the knife, threatening to use it (against whom, the record is not clear). In the words of Thorpe, "When she told that incident to me, it was something which had scared the fool out of her."

Cassie testified, in addition, that she had been afraid that her testimony would reveal that she had been associating with a convicted felon in violation of the terms of her probation. She had felt, moreover, that she would not be a good character witness because of her prior record of convictions of several forgeries and a theft by taking.

The defendant insists that Cassie's testimony would have been sufficiently helpful that he would have used her as a defense witness had she not been rendered unavailable by prosecutorial misconduct. We conclude that, whether or not Cassie's testimony would have benefited the defendant's case, her absence was not the result of

prosecutorial misconduct.

The trial court found that assistant district attorney Thorpe committed no impropriety when he attempted, in Cassie's presence, to persuade Jessie to cooperate by telling him the facts of the case and by emphasizing the strength of the evidence against the defendant. We agree with this finding. The record does not suggest that anything Thorpe told Jessie was untrue. Any "chilling effect" in this regard was simply a natural consequence of the antipathy evoked by the facts of the crime. The record, moreover, shows that Cassie had additional reasons for not wanting to get involved in the case, and these reasons had nothing to do with any conduct, or misconduct, on the part of anyone in the district attorney's office.

The trial court further found that no one in the district attorney's office ever told Cassie or Jessie that they could not testify for the defense or that they should not cooperate with the defense. Nor, the trial court found, did anyone in the district attorney's office threaten Cassie regarding her probationary status. These findings are supported by the record.

The record simply does not support the defendant's claim of prosecutorial overreaching, and the defendant's twenty-sixth enumeration of error is meritless.

17. In his twenty-seventh and twenty-eighth enumerations of error, the defendant contends that, although he made a timely and sufficiently specific request for the defendant's statements under OCGA § 17-7-210 (Code Ann. § 27-1302), the state failed in two instances to supply the defendant with statements which were thereafter used at trial.

(a) During the guilt-innocence phase of the trial, co-defendant Jenkins testified that, while he and the defendant were in custody following their arrest for the crime on trial, the defendant told Jenkins, "Look, if anybody asks you, I was wired out on acid. I'm going to try and get an insanity plea."

No objection was interposed to this testimony. This procedural default precludes further review of Jenkins' testimony. *Rivers v. State,* 250 Ga. 303, supra, (7).

(b) Durwood Shores testified, at the sentencing phase of the trial, that after he and the defendant got "locked up" for an armed robbery in 1977, the defendant said that if he ever committed another one, he would not leave any witnesses. The defendant was not notified, prior to trial, that this statement would be introduced in aggravation by the state. The defendant's only objection to this testimony, at trial, was that it was not "proper redirect." On appeal, he contends that admission of this testimony was error under OCGA § 17-7-210 (Code Ann. § 27-1302).

We need not determine if OCGA § 17-7-210 (Code Ann. § 27-1302) requires the state, upon timely demand, to provide the defense with custodial statements made by the defendant years before he committed the crime for which he is on trial. See *Walraven v. State,* 250 Ga. 401 (2) (297 SE2d 278) (1982). Nor need we determine the applicability of OCGA § 17-10-2 (a) (Code Ann. § 27-2503) (which provides "that only such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible"). Assuming that the proffered testimony was subject to exclusion, on proper objection, under either of the above Code sections, since no such objection was made, we need only determine whether the testimony rendered the defendant's death sentence invalid on the basis that it was imposed under the influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-30 (c) (1) (Code Ann. § 27-2534.1). We conclude that Shores' testimony did not have that effect. Testimony that the defendant spoke to Shores of leaving no witnesses, adds nothing inflammatory to a record that includes testimony from both of his co-defendants that, on the night of the armed robbery, the defendant stated that he did not intend to leave any witnesses.

18. In his twenty-ninth enumeration of error, the defendant contends that the trial court should have granted his motion for new trial as to sentence, based on newly discovered evidence.

Prior to and for some time after the defendant's trial, Jones was confined in the Houston County jail, in a "solitary" section of the jail containing nine cells. Also confined in this section of the Houston County jail were William Durden, Ellis Wayne Felker and Charles Wayne Radford, all of whom were being held on murder charges. At the hearing on the defendant's motion, these three fellow prisoners testified that Jones had bragged to them that Jones and not the defendant had shot Peterman.

Specifically, Jones had stated to his fellow prisoners that he and the defendant had entered the store and confronted Mrs. Riggs, who was alone. Jones left the store to confront Peterman and, when Peterman reached for his gun, shot him twice. Mrs. Riggs was shot by the defendant.

The testimony of Felker, Durden and Radford was corroborated by Jones, who admitted at the hearing that he had told his fellow prisoners the foregoing story. He testified, however, that it was not true, and that, just as he had testified at trial, the defendant had shot both Mrs. Riggs and Peterman. When asked why he told his fellow prisoners otherwise, he explained that they were all charged with violent crimes and inclined to regard disfavorably his cooperation with the state in a murder case, and that he therefore made false

statements to them for his own protection, to make him "look big in front of them."

It is undisputed that neither the prosecution nor the defense was aware until late November 1982 (some three months after the trial), that Jones had made extrajudicial statements which were inconsistent with his trial testimony. The state does not contend that the defendant's attorneys lacked diligence by failing to discover these inconsistent statements, and concedes that these statements would have been admissible as substantive evidence under the rule announced in *Gibbons v. State,* 248 Ga. 858 (286 SE2d 717) (1982).

The defendant contends that, since the evidence presented at trial showed that the defendant shot both victims, the newly discovered evidence, which tends to show that he only shot one, might have persuaded the jury not to impose the death penalty. Thus, the defendant contends, he is entitled to a new trial as to sentence.

Pretermitting any question whether the "newly discovered" evidence is, in fact, newly discovered,[3] we conclude that it is not of such materiality as to require a new trial. See *Emmett v. State,* 232 Ga. 110, 117 (205 SE2d 231) (1974). Had the jury been presented with Jones' extrajudicial statements, and had it chosen to believe them, it nonetheless would have been confronted by undisputed evidence that the defendant shot and killed Mrs. Riggs and was a party to the shooting of Peterman, all of which occurred during an armed robbery at which the defendant had planned to leave no witnesses. More importantly, it is highly unlikely, in view of the other evidence presented, that the jury would have chosen to believe Jones' jailhouse braggadocio.

To believe Jones' extrajudicial statements, the jury would have had to reject credible evidence establishing that Mrs. Riggs and Peterman were shot by the same gun. It would have had to reject the testimony of the two teenagers who testified that they were in the store when it was robbed and that only one of the robbers entered the store. It would have had to ignore Jenkins' testimony, which was consistent with the testimony of Jones and inconsistent with Jones' extrajudicial statements. And it would have had to disbelieve the defendant's admission that he had shot Peterman.

Our conclusion that the defendant is not entitled to a new sentencing trial is bolstered by a letter the defendant sent, after trial, to Jones (which would be admissible on retrial). In this letter, the

---

[3] If the defendant had shot only Mrs. Riggs, he surely would have been aware of the fact even if he was unaware that Jones had made any statements in support thereof.

defendant stated:

"I want you to know that I don't hold any hard feelings against you because in my eyes you told things as close to the truth as possible. But I think we both know that you got more than 10 dollars! . . .

". . . I'm sorry I got you into this shit, Bobby, and I want you to know that is the truth. We half-ass did a job and this is our price for mistakes."

The trial court properly denied the defendant's motion for a new sentencing trial, and the defendant's twenty-ninth enumeration of error is meritless.

19. Nothing in Enmund v. Florida, —— U. S. —— (102 SC 3368, 73 LE2d 1140) (1982), implies that, where the prosecutor waives the death penalty for two of three co-defendants, he may not seek a death penalty against a third. Nor does equal-protection doctrine mandate that co-defendants receive identical sentences. The defendant's fifth enumeration of error is meritless.

### Sentence Review

20. The jury found the following statutory aggravating circumstances: "(1) The offense of murder was committed by a person with a prior record of conviction for a capital felony. (2) The offense of murder was committed while the offender was engaged in the commission of another capital felony, to-wit: armed robbery."

The first statutory aggravating circumstance is supported by evidence (certified copies of prior convictions) that the defendant had three prior convictions for armed robbery. The second statutory aggravating circumstance is supported by the same evidence which supported his conviction.

The jury's finding of statutory aggravated circumstances is supported by the evidence beyond a reasonable doubt. OCGA § 17-10-35 (c) (2) (Code Ann. § 27-2537).

21. After review of the record in this case, including arguments of counsel, the charge of the court and matters dealt with in Divisions 11, 16 and 17 of this opinion, we conclude that the sentence of death was not imposed under the influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1) (Code Ann. § 27-2537).

22. We find that the sentence of death is not excessive or disproportionate to sentences imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3) (Code Ann. § 27-2537). Our cases show that juries find the death penalty to be appropriate punishment where an adult defendant commits murder during an armed robbery.

In this case, the defendant stated before the robbery began that

he intended to leave no witnesses. He thereafter shot two unresisting, unarmed victims, each of whom was dropped by one shot and thereafter shot in the head. The defendant intended to kill both victims and only by chance did one survive. The callous and cold-blooded behavior of this defendant has been condemned by death in many other cases.

In addition, the defendant had been convicted three times previously of armed robbery. This serious prior record of conviction for capital felonies additionally supports the imposition of the death penalty in this case.

The cases listed in the appendix support the death penalty in this case.

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 7, 1983 —
REHEARING DENIED JULY 21, 1983.

*J. Robert Daniel,* for appellant.
*Willis B. Sparks III, District Attorney, Thomas J. Matthews, Assistant District Attorney, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General,* for appellee.

APPENDIX.

*Castell v. State,* 250 Ga. 776 (301 SE2d 234) (1983); *Horton v. State,* 249 Ga. 871 (295 SE2d 281) (1982); *Jones v. State,* 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State,* 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State,* 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State,* 246 Ga. 697 (273 SE2d 124) (1980); *Tucker v. State,* 245 Ga. 68 (263 SE2d 109) (1980); *Jones v. State,* 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State,* 243 Ga. 627 (255 SE2d 718) (1979); *Spivey v. State,* 241 Ga. 477 (246 SE2d 288) (1978); *Davis v. State,* 241 Ga. 376 (247 SE2d 45) (1978); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Young v. State,* 237 Ga. 852 (230 SE2d 287) (1976); *Stephens v. State,* 237 Ga. 259 (227 SE2d 261) (1976); *Spencer v. State,* 236 Ga. 697 (224 SE2d 910) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Mason v. State,* 236 Ga. 46 (222 SE2d 339) (1976); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975).

ON MOTION FOR REHEARING.

We note that the trial judge, in his ruling on the state's challenge for cause of prospective juror Ms. Leckie, made a finding of fact that the prospective juror was conscientiously opposed to the imposition of the death penalty. We point out that it is helpful to this court for

the trial judge to make such a finding rather than merely ruling on the challenge, particularly when several months have passed since the case was tried by the time the case reaches this court.