72140. TEW v. THE STATE.
(346 SE2d 833)

BIRDSONG, Presiding Judge.

The defendant, Johnnie Tew, appeals his conviction of voluntary manslaughter. Tew, was indicted for the murder of Elvin Simmons. Tew was white. Simmons, who was also known as "Smokey," was black. Simmons was drinking beer with a friend in the Scorpio Lounge in Lumpkin Plaza just outside the entrance to Fort Benning in Muscogee County, Georgia. His girl friend, Sheila Hunter, with whom he had been living, came into the lounge with another man. Simmons and Hunter began an argument. Most witnesses agreed that there were no blows passed but the argument was just "loud." The argument continued outside the lounge in front of Scully's Liquor Store. Merrick Redding, Simmons' half-brother, went to the couple and asked them to quit arguing and then turned and went back toward the lounge.

Johnnie Tew was on his way home when he stopped by Scully's Liquor Store in Lumpkin Plaza, and bought a six-pack of beer. He placed the beer in his car and backed it away from the curb. Tew said that he saw a woman running down the street; Simmons was right behind her. Hunter put her hand on the hood of his car and he had to put on his brakes, thereby stalling the engine. Tew said he saw Simmons strike Hunter, knocking her to the ground. Tew testified that he

said "you shouldn't be beating on that lady like that" and Simmons turned toward him and said: "I'm going to get some of your white honky a___, too. And he started to the car. And I says, Smokey, and he didn't pay me no mind. He looked like he was wild." Tew said he had a .22 caliber pistol with him, that he had taken as security for a loan of $20, and he placed the pistol over his left arm, pointing it at Simmons. Tew said that Simmons reached over the weapon and grabbed his wrist. He and Simmons struggled and the gun fired. Tew denied that he pulled the hammer back or pulled the trigger. Simmons was shot through the heart. The bullet entered the middle area of his chest just under the fifth rib and went on a downward path, lodging next to the spinal column, just under the tenth rib. The coroner said this was a trajectory angle of 22 degrees. The defendant's expert testified that the trajectory angle was 45 degrees. In both cases, the deceased would have to be bending forward, either at an angle of 22 degrees, or 45 degrees. There were no powder marks on Simmons' shirt or around the entry wound. Tests showed this particular pistol dispersed powder marks up to three feet and was "single action," which required the hammer to be manually cocked before firing.

Merrick Redding said he saw Tew come out of the liquor store and tell his brother: "Nigger, if you don't leave that girl alone I'll shoot you." Redding heard his brother reply: "Are you going to shoot me? Shoot me." "As he [Tew] backed his car out he pulled up beside of my brother and exchanged some words and fired one shot and shot down the road." Simmons did not have a weapon. His brother was 8 to 10 feet from Tew when he was shot. Simmons and Hunter were on the raised island when Tew was talking to them, not near the car. Neither Simmons nor Hunter was hitting the other person. The police found Simmons' body on the paved portion of the parking lot, about one foot from the curb.

Kenneth Baker, a friend of the deceased, had been drinking beer with him, when Simmons started arguing with Hunter and they went outside. He told Redding to talk to his brother. "And then [Redding] walked down there and talked to them. Then he turned around and came back. I was going toward the mail box, the news box in Subs on Wheels shop and I stopped right there. And then Merrick stopped again. I turned around. Then I heard something like a firecracker, gun. I turned back around . . . I seen [sic] Sheila running hollering that Smoke had been shot."

Sheila Hunter testified that she was with another man when Simmons saw her and they began arguing. He did not hit her. She heard Tew say something and looked up to see him pointing a gun at them. Simmons said: "Are you going to shoot?" And, Tew said: "Yeah, I'll shoot your a___." The District Attorney demonstrated the distance

between Tew and Simmons but did not place the distance in the record. Hunter said that she and Simmons were on the raised island, not in the paved portion of the parking lot when Simmons was shot.

Hunter admitted that she had told the DA and the defendant's attorney another version of the encounter between Tew and Simmons that she ran away before the fatal shot was fired and did not see it. Hunter testified that she told defendant's counsel she ran before the shot was fired and went behind Tew's car. She was asked: "So you had already passed the back of his car before the shot was fired? Yeah. I might have been three or four steps from behind the back of the car."

Daisy Irvin lived next door to Hunter's mother, and Hunter told her that she had taken some hamburger and pork chops from Simmons' refrigerator. Simmons had come to her mother's house, "mad," and had gone on to the beer tavern where he met Hunter. Kenneth Baker testified that Simmons and Hunter were arguing "[s]omething about some meat. . . ." Irvin said that Hunter told her that when Simmons saw her with this other man "she ran and she was screaming and said that she heard a gunshot fire and she looked back and she saw [Simmons] lying on the ground." Irvin asked Hunter what would have happened if Tew had not come to her rescue, and "she said either he would have hurt me bad or killed me." Irvin also testified that she heard Merrick Redding say that his mother had sued Tew for killing her son and he (Redding) was going to wind up with Tew's Cadillac and house.

The defendant offered in evidence a prior conviction of Redding for burglary, and convictions of Hunter for theft and loitering for purposes of prostitution. Tew brings this appeal from his conviction for voluntary manslaughter. *Held*:

1. Defendant contends the court erred in charging the jury on the offense of voluntary manslaughter, and the jury erred in returning a verdict finding him guilty of voluntary manslaughter. We do not agree. "A person commits the offense of voluntary manslaughter when he causes the death of another human being . . . as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . ." OCGA § 16-5-2 (a). The issue here is whether Tew acted "solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . ." *Veal v. State*, 250 Ga. 384, 385 (297 SE2d 485). "When a homicide is neither justifiable nor malicious, it is manslaughter, and if intentional, it is voluntary manslaughter." *Washington v. State*, 249 Ga. 728, 730 (292 SE2d 836); *Starr v. State*, 134 Ga. App. 149 (1) (213 SE2d 531); *Gainey v. State*, 132 Ga. App. 870 (1) (209 SE2d 687). And, in the trial of a murder case if there be any evidence, how-

ever slight, as to whether the offense is murder or voluntary manslaughter, the trial court should instruct the jury on both offenses. *Brooks v. State*, 249 Ga. 583, 585 (292 SE2d 694). "While words and threats alone are generally not sufficient provocation, the issue of whether a reasonable person acts as the result of an irresistible passion may be raised by words which are connected to provocative conduct by the victim." *Veal v. State*, supra at 385; *Washington v. State*, supra at 731. Here defendant said the victim told him that he was "going to get some of your white honky a___," and then reached into his car and grabbed him by the wrist. The victim's brother testified that Tew told the deceased: "Nigger, if you don't leave that girl alone I'll shoot you." Hunter also heard Tew tell the victim: "I'll shoot your a___." If believed by the jury, the first statement by the victim, when connected to the victim's movement toward, and close proximity to, defendant's car, could be sufficient provocation. *Veal*, supra at 385; *Washington*, supra at 731. The latter two statements attributed to Tew are indicative of passion and anger on the part of the defendant. The evidence that the pistol was a single action revolver and had to be cocked manually, and dispersed powder burns up to three feet, and the lack of powder burns on the victim, confirms the victim's distance from the defendant at the time of the shooting and contradicts Tew's claim of accident. The fact that Tew shot the victim and then "shot down the road" in his car is some evidence of flight which would authorize a jury to find consciousness of guilt. *Bridges v. State*, 246 Ga. 323, 324 (271 SE2d 471).

Accordingly, we find there was sufficient evidence to authorize the charge on voluntary manslaughter, and such evidence, when viewed in the light favorable to the verdict, is sufficient to enable any rational trier of facts to find the existence of the offense of voluntary manslaughter beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560).

2. The defendant alleges error in the use of a statement made by him to the police at the time of his arrest. He contends there was no showing of voluntariness and it was obligatory on the court to make such finding before permitting the use of the prior statement. We do not agree. During the trial, Tew testified he was attacked by the victim and his pistol fired accidentally. In rebuttal the state produced a witness to show that Tew told him at the time of his arrest that he did not own a gun, and "didn't shoot nobody. I don't know nothing about it." The Supreme Court, in *Harris v. New York*, 401 U. S. 222 (91 SC 643, 28 LE2d 1), allowed the use of a prior inconsistent statement by a defendant for impeaching purposes which would not otherwise be admissible, as long as the jury was properly instructed as to the limited purpose of the statement. *Miranda* forbids the use of defendant's statements in violation of its requirements as evidence of

guilt. But, *Harris*, supra, holds that the shield of *Miranda* may not be turned into a sword, and allows a limited exception to prevent this from happening. *State v. Byrd*, 255 Ga. 665 (341 SE2d 455). Hence, a defendant may not testify at trial in a manner inconsistent with his prior statement, without having to face the issue before the jury. The trial court must limit the use of the statement to impeachment, as was done in the instant case, and prevent its use as evidence of guilt. *Jones v. State*, 243 Ga. 820, 826 (256 SE2d 907). Since the prior statement is admissible for impeachment purposes, even if in violation of *Miranda*, a *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) hearing and finding of voluntariness, is unnecessary. *Scott v. State*, 243 Ga. 233 (1) (253 SE2d 698). There was no error.

3. Error is enumerated in the admission of evidence that Tew had a prior altercation with a different black man. Defendant claims this was evidence of bad character. On cross-examination of Tew, counsel asked him why he went to his daughter's house, threw his gun up on the roof of the house and left his car there, and then walked home. Tew responded: "I knowed they'd go [to my daughter's house]. Everybody knew me in this neighborhood because I have tried to be a good neighbor and everyone knew me. And you can't find nobody that will say anything bad about me I don't believe out there." Later, counsel specifically directed his attention to that prior statement as to his general character and asked him if he "hit a black man over the head down at the Out Post Inn?" Defendant's counsel objected on the basis of the incident placing defendant's character in evidence. The court ruled that Tew had placed his character in evidence and permitted the question. We find no error. The defendant was not tricked into answering a question which called for character evidence. See *Smith v. State*, 141 Ga. App. 64 (2) (232 SE2d 401). His response did open the "character door" and permitted introduction of the contradictory evidence. *Shepherd v. State*, 239 Ga. 28 (2) (235 SE2d 533); *Brown v. State*, 237 Ga. 467, 468 (228 SE2d 853).

4. The defendant argues that the trial court erred in permitting the state to admit "prior consistent statements" allegedly made by its witnesses. The Supreme Court has ruled that prior out-of-court *consistent* statements of a witness are admissible where the witness is present in court, under oath and subject to cross-examination. *Lumpkin v. State*, 255 Ga. 363 (4) (338 SE2d 431); *Edwards v. State*, 255 Ga. 149 (2) (335 SE2d 869).

5. Prosecutorial misconduct is alleged when the assistant district attorney made certain statements in front of the jury which were contradictory to the testimony of the witness who was then testifying. The defendant had called a witness to introduce impeaching evidence of a state's witness. The prosecutor asked her if she had notified the district attorney's office of the impeaching evidence. She said "[a]

D.A. came to my house after Mary Worth talked to her lawyer. . . . [The man that came to my house] told me that his name was Mr. Condo or something on that. . . ." The assistant D.A. who was prosecuting the case was named Conger. The witness then described the "D.A." Mr. Conger asked her: "It wasn't me, was it? A. I'm not sure. The voice kindly sounds like it. But I'm not sure. . . . Q. . . . And you ain't saying it's me I hope. A. Well, I'm not sure. The voice sounds pretty — and the questions is pretty much alike. . . . Q. What kind of car was this man in? A. It was a light yellow, I'm not sure if it was a Mercury. . . . I know it was a big, light yellow car . . . ." Mr. Conger: "I ain't got no light yellow car, never had one, never been in one."

On cross-examination, the defendant said his car stalled when the woman the victim hit ran into his car. The prosecutor then asked defendant: "Q. You didn't crank it up when you say it stalled, did you? A. I didn't have time to. Q. . . . I didn't ask you whether you had time to. A. No, sir. I did not crank it up. Q. You can make speeches when your lawyer is asking you questions." Later in cross-examination of the defendant, counsel asked: "Q. Oh, now you're telling us you tried to start the car, huh? A. After, after the gun went off, yes. Q. Yes, sir. After you done blasted Elvin Simmons in to the history books. You didn't try to start that car before you shot him. You wanted to shoot him — A. I didn't have time."

Later, on cross-examination of defendant Tew, the prosecutor asked: "Q. Now, Mr. Tew, everything you did after you shot Elvin Simmons was just what a man would have done who had murdered somebody else and was trying to get away with it." A succeeding question was: "Q. And then like a thief in the night, like a man who had murdered you snuck off and you hide the car and you hide the gun and you go on down to your house; isn't that right?" Following the court's ruling to "disregard the characterization of him as a thief in the night . . ." counsel asked: "Q. Like a murderer you sneak on down to your house, run away from the scene, hide the gun, hide the car and go to the other house. . . ." The following colloquy took place between the prosecutor and the defendant: "Q. So you had to change your story — A. I haven't changed anything. . . . Q. Not as you know of? So you had to change to one that would have a better chance of floating before a Jury from I didn't do it to this self-defense accident?"

The prosecutor asked another defense witness how often he saw Tew in the liquor store before the incident with Simmons and he said that he did not pay that much attention to customers. The prosecutor persisted: "Q. Now [how] often, you don't know if he came in once a week, every other day or what? A. Once a week, okay. Q. Sir? A. Once a week sounds good. Q. Well, now, I don't care what sounds good,

Buddy. We ain't asking you what sounds good. We're asking you to tell the truth."

There are other instances cited by the defendant to which he assigns error, claiming they represent prosecutorial misconduct, but the above excerpts are typical.

The actions of the prosecutor do not fall within the type usually characterized as "prosecutorial misconduct" in cases typified by *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104), *Fugitt v. State*, 251 Ga. 451 (307 SE2d 471); and *Abdi v. State*, 249 Ga. 827 (294 SE2d 506). These actions of the prosecutor are more like those of *Mincey v. State*, 251 Ga. 255 (304 SE2d 882), and may be categorized as prosecutorial overreaching which could have an intimidating or chilling effect upon the witness, and included questions which characterized the defendant's conduct, and was blatant improper argument to the jury during examination of witnesses. These inappropriate acts do not rise to the level of injury or prejudice which would require reversal but are within the realm of those we find that it was "highly probable" they did not contribute to the verdict. *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869).

6. The seventh and eighth enumerations are considered jointly. Defendant claims it was error for the trial court to refuse to charge the "designated felony" law of this state, and in refusing to permit him to comment on the Designated Felony Act (then Code Ann. § 24A-2301a; now OCGA § 15-11-37), because Merrick Redding, a state witness, was 16 years old when he committed the offense of burglary and the only way for him to be tried by a superior court would be for the juvenile court to transfer the offender, and in Georgia "you aren't treated as an adult until you reach the age of seventeen unless you are a bad boy." The state's objection was sustained and defendant's counsel was instructed he could "argue that [Redding] is a convicted burglar and argue that alone or that only." We find no error.

Redding's age was introduced in evidence and when the burglary was committed he was only 16 years of age. The Designated Felony Act provides that it means an act, which if done by an adult, would be one of a designated group of offenses, which includes burglary. Code Ann. § 24A-2301a (a) (2) (D). However, the Designated Felony Act provides for "restrictive custody," "intensive supervision," custody of the Division of Youth Services and Youth Development Center and not for transfer to the superior court for prosecution as an adult. See Code Ann. §§ 24A-2301a and 24A-2302a. Transfer of jurisdiction to the superior court is governed by Code Ann. § 24A-2501 (now OCGA § 15-11-39). Since there was no evidence introduced that Redding received treatment under the Designated Felony Act, rather than the usual transfer under a different code section, we find no error in the trial court refusing to charge the Designated Felony Act

and to refuse defendant's counsel permission to argue its implication. See *In the Interest of J. J. S.*, 246 Ga. 617 (1) (272 SE2d 294); *W. O. W. v. State of Ga.*, 155 Ga. App. 714 (4) (272 SE2d 498); *K. G. W. v. State of Ga.*, 144 Ga. App. 251 (2) (240 SE2d 755); U. S. cert. den. 439 U. S. 846; *J. J. v. State of Ga.*, 135 Ga. App. 660 (218 SE2d 668). These enumerations are without merit.

7. It is alleged that the trial court erred in refusing to charge, as requested, on the physical disparity between the victim and the defendant. Defendant cites *Fickling v. State*, 166 Ga. 487 (143 SE 430) as authority for this assertion of error. *Fickling* involved a claim of self-defense based upon a difference in the size of the victim and the defendant. In the instant case, defendant asserted only a defense of accident. Where self-defense is alleged as justification for the acts of the accused, the physical disparities of the parties are relevant and the jury may properly consider them in determining whether there was a reasonable apprehension of danger, and whether the accused used excessive force to protect himself or to repel an attacker. See generally 40 AmJur2d 447, Homicide, § 159. Physical disparity of the defendant and victim would not generally be relevant where a defendant relies upon a defense of accident, as in the instant case. See generally 40 CJS 1144-1145, Homicide, § 224 (a). There was no evidence in the case at bar that Tew fired the weapon out of fear, justification, or in self-defense. See *Jones v. State*, 212 Ga. 195 (2) (91 SE2d 514). Inasmuch as self-defense was not placed in issue and it is not error to refuse to charge on a theory not in issue, this enumeration is without merit. *Pitts v. State*, 253 Ga. 461 (2) (321 SE2d 708).

8. It is not error to refuse a new trial based upon the grounds asserted therein.

*Judgment affirmed. Banke, C. J., concurs. Sognier, J., concurs specially.*

SOGNIER, Judge, concurring specially.

I concur in all divisions except Division 4. I specially concur with Division 4, which allows the witnesses' testimony to be bolstered under authority of *Edwards v. State*, 255 Ga. 149, 150 (2) (335 SE2d 869). As pointed out by Justice Bell in his special concurrence in *Lumpkin v. State*, 255 Ga. 363, 365 (4) (338 SE2d 431), the bolstering in *Edwards* was allowed because the appellant sought to discredit the witnesses' testimony. *Lumpkin*, cited as authority for Division 4, enunciates a departure from *Edwards* and new law on the issue. Although I disagree with the soundness of *Lumpkin* as a legal principle, it is the law and for that reason I specially concur. In addition I deem "bolstering" harmless in this case.

Decided May 7, 1986 —
Rehearings dismissed May 27, 1986 and June 17, 1986 —

*James A. Elkins, Jr.*, for appellant.
*William J. Smith, District Attorney, J. Gray Conger, Assistant District Attorney*, for appellee.